[No. S040500. June 8, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
LANCE CHRISTOPHER BADGETT et al., Defendants and Appellants.

**COUNSEL**

David D. Carico and Lynda A. Romero, under appointments by the Supreme Court, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Mathias and Herbert F. Wilkinson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

LUCAS, C. J.—The Court of Appeal reversed murder and conspiracy convictions entered against defendants Lance Christopher (Chris) Badgett and John Badgett on the ground the trial court erred in denying their motion to exclude the assertedly coerced testimony of the prime prosecution witness.

We reverse the judgment of the Court of Appeal. Although defendants had standing under due process principles to complain of the admission of coerced trial testimony of a third person, our examination of the entire record persuades us defendants fail to demonstrate such a due process violation actually occurred at their trial. We also conclude the Court of Appeal erred in rejecting the trial court's ruling on a question of marital privilege. The trial court correctly determined that defendant Chris Badgett could not assert the privilege for confidential marital communications as to certain testimony of the prime prosecution witness, on the ground that he had not entered into a valid marriage with the witness in Texas.

## FACTS

Defendants Chris and John Badgett, who are brothers, were convicted by jury of first degree murder (Pen. Code, § 187),[1] and conspiracy to commit murder (§ 182). Both were sentenced to 25 years to life in state prison.

The victim was Michael Palmer from Devine, Texas, who accompanied the brothers from Texas to California when they left Texas to avoid revocation of probation. All three had apparently agreed they could never return to Texas.

Palmer's dismembered body was discovered in Santa Cruz. Police identified the body and sought the brothers for questioning, because it appeared all three men had applied for driver's licenses on the same date, using false identification papers but listing the same home address. Further, the victim had listed John Badgett as a reference in a job application. Police identified yet another driver's license applicant with the same home address, namely Henrietta (Retta) Jasik. All were from Devine, Texas. All three were arrested. Jasik's arrest was for having submitted a false driver's license application.

The primary prosecution evidence was supplied by Jasik, who was 17 years old at the time of her arrest. She testified under a grant of immunity that was the subject of dispute at trial.

Jasik testified that on the night of the murder of Michael Palmer in February 1989, she went with Chris Badgett out on the balcony of the condominium they all shared, and Chris brought up the subject of Palmer wanting to return home. Palmer had not said anything that evening about wanting to go home, but had mentioned on other occasions that he missed his wife and wanted to return to Texas. Chris told Jasik that he wasn't sure if he "should off him or not" or "if his brother would go along with it." Jasik thought Chris was "just in one of his moods."

According to Jasik, about half an hour later, Jasik, John Badgett, and the other two occupants of the apartment, Theresa Badgett and Joe Albano, went out on the balcony together. John Badgett said that since Palmer had talked so much about returning to Texas, they were going to send him back there on a bus. Theresa Badgett called to ascertain bus departure times and gave John Badgett a Versateller automatic teller machine card so he could borrow money for the ticket. Chris Badgett told everyone not to tell Palmer so they could surprise him. Someone told Palmer they were going to a party. Palmer

---

[1] All statutory references are to the Penal Code, unless otherwise indicated.

called his job to get the night off. Jasik told Palmer, at Chris Badgett's request, that because she had to work the next day, she would not be going along. Chris, John, and Palmer left around 11 p.m. Chris and John returned around 4 a.m. Chris told Jasik that Palmer was on a bus back to Texas and would call in three days.

Jasik testified that a day or so later, Chris told her that he and John had driven Palmer up into the mountains and then stopped to smoke cigarettes. Palmer referred to Jasik and said he was glad she had not come with them. Chris was offended by these comments. When Palmer bent over to pick up the lighter he dropped, Chris shot him. Palmer rolled down the hillside and stopped at the base of a tree. There, while Chris held a flashlight, John dismembered Palmer and put the parts in a plastic bag Chris had placed in the car before they left. They took the bag down the road and threw the parts into the ocean.

Jasik also testified that at Chris's direction, she and John drove to San Francisco and threw the gun used in the murder off the Golden Gate Bridge.

Jasik testified that initially, when questioned about the disappearance of Palmer, she told the police that he had returned to Texas, and that she had been told that he had called to report his safe arrival there. Several days after she was arrested and brought to the juvenile facilities in Santa Cruz County, her mother arrived from Texas and told her she "had to tell the truth whether it hurt or not," and that she needed to "tell the truth and after that we can go home and not have to worry about anything." As a consequence, she decided to cooperate with the police. She told Officers Moore and Mansfield about the conversation in which Chris Badgett admitted to her that he had killed the victim and about the defendants' efforts to conceal their guilt after the crime, but she did not tell the officers about her conversation with Chris Badgett before the killing in which he said he did not know if he could trust the victim, and might have to kill him.

At a juvenile detention hearing upon a petition charging Jasik with obtaining a false identification and with being an accessory to murder, Jasik appeared, accompanied by her mother and her attorney, Stuart Rich, who had been appointed to represent Jasik on the perjury charges pending in juvenile court. A preliminary immunity agreement was entered on the record at that hearing and Jasik was released from custody and returned to Texas with her mother. Rich served as Jasik's appointed counsel until the first preliminary hearing, when juvenile charges against Jasik were dismissed and he was relieved. He continued to serve as retained counsel for a nominal sum until after the second preliminary hearing, when he withdrew because he

anticipated being called at trial as a witness for the defense. Jasik remained unrepresented through trial.

Although initially she withheld this information from the police, Jasik did inform Rich of Chris Badgett's preoffense statement about the necessity of killing the victim. Eventually she also told Rich that she had Chris's jacket and that it might have blood on it. Before the first preliminary hearing, Rich arranged for her to disclose these facts to the police on a further understanding regarding her immunity for the forthcoming statement and for turning over the jacket. Tests of the jacket did not disclose any blood.

Jasik was never provided with full transactional immunity, but received use immunity for her statements, as well as transactional immunity for crimes other than murder and perjury.

At trial, Chris Badgett made an *in limine* motion to exclude evidence of his statements to Jasik on the ground of marital privilege, claiming a common law marriage with her under Texas law. After a lengthy evidentiary hearing, the court ruled there was no common law marriage between Jasik and Chris under Texas law, and denied the motion.

The defense also made an *in limine* motion to exclude Jasik's trial testimony, asserting it was the product of an illegal arrest, an involuntary pretrial statement, improper interference with Jasik's counsel, and a coercive immunity agreement. Defendants claimed admission of such evidence at trial would violate their right to due process. Defendants made a lengthy offer of proof, alleging that Jasik was unlawfully incarcerated in Santa Cruz County for having a false identification because the charges arose from conduct in Santa Clara County. (See § 830.1; Welf. & Inst. Code, § 626.) They also alleged that Jasik's initial cooperation with the prosecution was coerced by a promise of leniency, because police officers told Jasik she would be released from custody if she cooperated with them. They alleged that the prosecution had interfered with Rich's representation of Jasik, and, finally, that the immunity agreement itself was coercive because it required Jasik to testify consistently with her previous statements to the police.

The trial court denied the motion on the ground that defendants lacked standing to make these claims, but made it clear that defendants were free to develop evidence before the jury of any coercion of the witness, including any evidence referred to in defendants' offer of proof.

At the conclusion of the evidentiary portion of trial, defendants moved to dismiss or, in the alternative, to strike Jasik's testimony on the ground that

the immunity agreement was coercive. The trial court denied the motion, but advised defendants they were free to argue to the jury that her testimony should be discounted because of the agreement.

The jury convicted both defendants of murder and conspiracy, and both appealed. The Court of Appeal reversed on the ground that the trial court erred in rejecting, for lack of standing, what the Court of Appeal characterized as defendants' motion to exclude both Jasik's testimony and her out-of-court statements. The Court of Appeal also concluded the trial court erred in rejecting the motion to exclude evidence on the basis of the privilege for confidential marital communications. We granted respondent's petition for review.

## DISCUSSION

### 1. Exclusion of Third Party Testimony

#### a. Scope of Right

Defendants sought the exclusion of the trial testimony[2] of Henrietta Jasik "on the grounds that the witness Henrietta Jasik's in court testimony is the result and unlawful product of her involuntary statements to the police. *Factors which* caused these statements to be involuntary and *affect the admissibility of the witness'[s] testimony* are (1) the witness's illegal arrest and subsequent incarceration; (2) impermissible inducements made to the witness during her incarceration in order to get her to make statements; (3) subsequent immunity offers and agreements made to the witness that were

---

[2]Although the Court of Appeal stated that, in the *in limine* motion, defendants moved to exclude both Jasik's pretrial statements and her testimony, our review of the record indicates that the *in limine* motion only sought the exclusion of Jasik's trial testimony. Defendants filed a written motion that sought "an order suppressing the *testimony* of the witness Henrietta Jasik on the grounds that it was obtained illegally through impermissible coercion and inducements so as to deprive defendants of due process of law. . . ." (Italics added.) The points and authorities in support of this *in limine* motion did incorporate authorities and arguments in defendants' earlier writ petition challenging the denial of a section 995 motion, which in turn challenged the voluntariness of Jasik's statements. But in the context of the motion under review here, it is clear the incorporated authorities merely supported the motion's explicit claim that Jasik's testimony should be excluded because it was the fruit of earlier involuntary statements. Further, at the time set for *in limine* motions, counsel characterized the motion as a "pretrial or pretestimonial motion to examine the witness Henrietta Jasik as to the voluntariness of her *testimony* and to exclude that *testimony*." (Italics added.) At trial, although it does not appear that the text of the extrajudicial statement was received in evidence, the fact that Jasik had related Chris's admissions to the police came in without objection on her direct examination. Accordingly, we limit our discussion to the question preserved by the *in limine* motion; that is, whether the introduction of Jasik's trial testimony violated defendants' right to a fair trial.

conditioned upon her testimony being consistent with her involuntary statements; and (4) coercion applied to the witness regarding her right to and access to legal counsel." (Italics added.) Counsel made an offer of proof claiming that Jasik was arrested in violation of certain statutory provisions, but that after her improper arrest, the witness denied knowledge of the crime. Later, it was alleged, the police had Jasik's mother convey to her the offer that she would be released from custody if she told the truth. The offer of proof claimed that thereafter, Jasik made statements implicating defendants, and obtained immunity on condition she testify consistently with these statements. It was also alleged that when the defense sought to interview Jasik, the district attorney responded by interfering with her attorney-client relationship, eventually succeeding in terminating it. Counsel concluded: "The legal theory, illegal arrest, improper inducement based on conditional immunity offers, based on consistency and continual duress as to the representation of the witness in contacts by the prosecution, that's the theory."

The trial court determined defendants had no standing to argue on these grounds that Jasik's trial testimony should be excluded. Defendants renewed their claim on appeal, and the Court of Appeal concluded that they did have standing to make the claim, and that the denial of a hearing on their claim was itself a denial of due process.

■ Respondent argues the trial court correctly denied the motion on standing grounds, because defendants had no standing to seek the exclusion of trial testimony purely on the ground it was the product of an earlier involuntary statement of a third party.

■ In deciding whether defendants had standing to bring their motion, it is important to recall that defendants must allege a violation of their *own* rights in order to have standing to argue that testimony of a third party should be excluded because it is coerced. It is settled that the accused has no standing to object to a violation of another's Fifth Amendment privilege against self-incrimination. (*People* v. *Douglas* (1990) 50 Cal.3d 468, 501 [268 Cal.Rptr. 126, 788 P.2d 640] [hereafter *Douglas*].) Similarly, a defendant has no standing to complain of violations of another's Fourth Amendment rights. (*United States* v. *Payner* (1980) 447 U.S. 727, 731, 735 [65 L.Ed.2d 468, 473-474, 476-477, 100 S.Ct. 2439]; *In re Lance W.* (1985) 37 Cal.3d 873, 896 [210 Cal.Rptr. 631, 694 P.2d 744] [state vicarious exclusionary rule abrogated by Cal. Const., art. I, § 28, subd. (d)]). It is also the rule that defendants lack standing to complain of the violation of another's Sixth Amendment right to counsel. The right to counsel is a personal right (*Faretta* v. *California* (1975) 422 U.S. 806, 819-821 [45 L.Ed.2d 562, 572-574, 95 S.Ct. 2525]), and a violation of that right cannot ordinarily be

asserted vicariously. (See *People* v. *Varnum* (1967) 66 Cal.2d 808, 812-813 [59 Cal.Rptr. 108, 427 P.2d 772]; *United States* v. *Sims* (11th Cir. 1988) 845 F.2d 1564, 1568; *United States* v. *Partin* (9th Cir. 1979) 601 F.2d 1000, 1006.)

As we explained in *Douglas, supra,* 50 Cal.3d 468, if the defendant seeks to exclude a third party's testimony on the ground the testimony is somehow coerced or involuntary, "[a]ny basis for excluding [the third party's] testimony must be found in a federal constitutional right *personal* to defendant." (*Id.* at p. 501, italics added.) Further, the basis of the claim must be that coercion has affected the third party's trial testimony. Examining the relevant federal authorities, *Douglas* pointed out that in *Bradford* v. *Johnson* (E.D.Mich. 1972) 354 F.Supp. 1331, for example, the court held that a witness's trial testimony was so untrustworthy as to violate the defendant's right to a fair trial because the incarcerated witness was subject to *continuing* torture and beatings that could be resumed after trial if the witness failed to testify against defendant as planned. (*Id.* at p. 1336.) The mistreatment of the witness began before trial and produced a coerced out-of-court statement, but this was not in itself enough to require that the witness's testimony must be excluded. A further necessary element was that ongoing coercion might affect the witness's trial testimony. The witness's trial testimony was considered untrustworthy on due process grounds because the witness "must surrender himself immediately after testifying to those persons who tortured him." (*Ibid.*)

Similarly, we pointed out in *Douglas* that federal courts have held that pretrial coercion of a third party's statement presents no basis of relief to the defendant " '*if there was nothing improper about the trial itself.*' " (*Douglas, supra,* 50 Cal.3d at p. 502, italics added by *Douglas,* quoting *United States* ex rel. *Cunningham* v. *DeRobertis* (7th Cir. 1983) 719 F.2d 892, 896 [because coerced statement not offered at trial, no basis for relief even if statement aided in investigation]; see also *United States* v. *Merkt* (5th Cir. 1985) 764 F.2d 266, 274 [distinguishing suppression of third party's coerced statement when offered in evidence at trial from effort to suppress third party testimony alleged to be fruit of third party's coerced out-of-court statement].) Thus, only when the evidence produced *at trial* is subject to coercion are defendant's due process rights implicated and the exclusionary rule we analyzed in *Douglas* applied. When a defendant seeks to exclude evidence on this ground, the defendant must allege that the trial testimony is coerced (*Douglas, supra,* 50 Cal.3d at p. 500), and that its admission will deprive him of a fair trial (*id.* at p. 503).

 It appears from defendants' written motion and their offer of proof and argument to the court that they adequately framed their motion in terms

of a claim that Jasik's testimony itself should be excluded because a course of continuing coercion against her might infect her performance at trial. The motion was explicitly directed at her trial testimony, and tied her pretrial statements to her trial testimony by arguing that a coercive immunity agreement would require her to testify consistently with the coerced statements at trial. Counsel also argued that "continual duress" involving interference with Jasik's counsel amounted to a due process violation. Putting aside the question whether defendants could actually prevail on the merits in demonstrating that the trial testimony was coerced, or that the earlier statement had any effect on the trial testimony, we believe defendants had standing to make the motion.

Respondent reads defendants' motion too narrowly when it claims that they moved to exclude Jasik's trial testimony purely because it was the fruit of an earlier coerced statement. Two of the asserted grounds for exclusion were not based on the claimed coercion of the extrajudicial statements, but claimed that later events rendered the witness's *testimony* coerced. Even as to the claim that the statements were involuntary, it does not appear that the motion sought to exclude trial testimony purely because of the earlier allegedly involuntary statement by the third party. Rather, the motion sought exclusion of trial testimony because the witness was compelled to *testify* consistently with the allegedly involuntary statement at trial by reason of a coercive immunity agreement and other coercive conduct on the part of the prosecutor. In essence, the motion should fairly be understood to claim that the coercion that occurred before trial would continue to affect the witness's testimony through trial. As we will explain below, although we agree with respondent that a defendant cannot seek exclusion of trial testimony of a third party on the sole ground that it follows an involuntary extrajudicial statement of the witness, we do not interpret defendants' motion as making such a deficient claim. Defendants adequately asserted the violation of their own right to fair trial by alleging Jasik's trial testimony would be affected by the earlier coercion.

b. *Scope of Exclusionary Rule*

Defendants' motion to exclude Jasik's testimony was based on four related claims of coercion. As we have seen, two of the claims depended *in part* upon the assumption that if the pretrial statement of a third party is shown to be coerced, the third party's trial testimony must be excluded as a "fruit" of an involuntary statement. The first such claim was that Jasik's extrajudicial statements to the police were involuntary because they were the product of an arrest that violated section 830.1 of the Penal Code and section 626 of the Welfare and Institutions Code. Defendants' second such claim

attacked the voluntariness of Jasik's extrajudicial statements because of promises of leniency made to her while she was in police custody, and asserted that her trial testimony should have been excluded as the "fruit" of the involuntary statement.

Respondent urges that a defendant may not seek the exclusion of a third party's trial testimony on the sole ground it is the "fruit" of a prior statement that would be considered involuntary on Fifth Amendment grounds if it had been a statement of the accused. We have concluded that defendant's motion was not limited to such a claim, but also asserted that coercion applied before trial affected the witness's trial testimony. Nonetheless, we agree with respondent that a motion limited to the claim that a third party witness's trial testimony was the "fruit" of his or her earlier involuntary statement would be an insufficient basis for a motion to exclude.

In *Douglas, supra,* 50 Cal.3d 468, we stopped short of deciding whether the doctrine requiring the exclusion of the "fruit" of a defendant's coerced confession applies when the coercion affects a third party. Though we did not decide the issue, we noted we had previously dubbed such a claim as " 'doubtful.' " (*Id.* at p. 504, fn. 8, quoting *People* v. *Leach* (1986) 41 Cal.3d 92, 102, fn. 8 [221 Cal.Rptr. 826, 710 P.2d 893].)

When we compare the reason for the exclusion of statements taken in violation of the defendant's Fifth Amendment rights with the reason for excluding third party testimony upon a due process claim, we conclude that the exclusionary rule applicable to Fifth Amendment claims does not apply in the latter context. ■ The Fifth Amendment establishes that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." This privilege against self-incrimination prohibits the state from convicting a defendant on the basis of evidence compelled from the defendant's lips. Such evidence, although it may be reliable, is excluded largely to assure a fair contest between the state and the individual, and to force the government to undertake the entire burden of proving the defendant's guilt. As the high court explained in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]: "[T]he constitutional foundation underlying the privilege is the respect a government— state or federal—must accord to the dignity and integrity of its citizens. To maintain a 'fair state-individual balance,' to require the government 'to shoulder the entire load,' [citation], to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth." (*Id.* at p. 460 [16 L.Ed.2d at p. 715];

see also *Lego* v. *Twomey* (1972) 404 U.S. 477, 484-485 [30 L.Ed.2d 618, 624-625, 92 S.Ct. 619] [noting involuntary confessions are excluded regardless of their reliability].)

The reason for excluding statements that follow a first, involuntary confession of the defendant parallels the reason for excluding the original confession. The second statement is excluded because it is involuntary itself unless the "taint" of the first, involuntary confession has been attenuated by the passage of time or other reasons. (See *Clewis* v. *Texas* (1967) 386 U.S. 707, 710 [18 L.Ed.2d 423, 426-427, 87 S.Ct. 1338]; *Lyons* v. *Oklahoma* (1944) 322 U.S. 596, 603-604 [88 L.Ed. 1481, 1486-1487, 64 S.Ct. 1208]; see also *People* v. *Hogan* (1982) 31 Cal.3d 815, 843 [183 Cal.Rptr. 817, 647 P.2d 93]; *United States* v. *Perdue* (10th Cir. 1993) 8 F.3d 1455, 1467-1468.)

■ When the defendant seeks to exclude the fruit of the coerced statement of another, however, the policy of protecting the defendant from being compelled to aid the state in convicting him is not at stake. There is no danger that through the testimony of a third party, the burden of proof imposed on the state will be lightened. Thus, the principal reason for excluding evidence taken in violation of the privilege against self-incrimination, including successive, involuntary statements is simply not applicable in this instance.

Although courts analyzing claims of third party coercion have expressed some concern to assure the integrity of the judicial system (see, e.g., *United States* v. *Chiavola* (7th Cir. 1984) 744 F.2d 1271, 1273; *United States* v. *Fredericks* (5th Cir. 1978) 586 F.2d 470, 481, & fn. 14; *LaFrance* v. *Bohlinger* (1st Cir. 1974) 499 F.2d 29, 32-34), the primary purpose of excluding coerced testimony of third parties is to assure the reliability of the trial proceedings, as we recognized in *Douglas, supra,* 50 Cal.3d 468, 500. There, we explained, the defendant's emphasis on pretrial coercion "misperceives the limited nature of the exclusion recognized for coerced third party testimony. [Citation.] Because the exclusion is based on the idea that coerced testimony is *inherently unreliable,* and that its admission therefore violates a defendant's right to a fair trial, this exclusion necessarily focuses only on whether the evidence actually admitted was coerced. . . . [D]efendant can prevail on his suppression claim only if he can show that the trial testimony given by [the third party] was involuntary at the time it was given." (*Ibid.,* italics added, italics in original omitted.)

The purpose of exclusion of evidence pursuant to a due process claim such as defendants' is adequately served by focusing on the evidence to be presented at trial, and asking whether *that evidence* is made unreliable

by ongoing coercion, rather than *assuming* that pressures that may have been brought to bear at an earlier point ordinarily will taint the witness's testimony.

■ We also point out that there is a significant difference in the burden of proof applicable to a claim under the Fifth Amendment and defendants' claim that the testimony of a third party is subject to exclusion as a matter of due process. The burden is on the People to demonstrate the voluntariness of a defendant's admissions or confessions by a preponderance of the evidence. (See *Lego* v. *Twomey, supra,* 404 U.S. at p. 489 [30 L.Ed.2d at pp. 627-628]; see also *People* v. *Markham* (1989) 49 Cal.3d 63, 71 [260 Cal.Rptr. 273, 775 P.2d 1042] [applying federal standard].) Similarly, it falls to the People to demonstrate, in the case of successive confessions or statements, that the "taint" of a first, involuntary statement has been attenuated. (*People* v. *Hogan, supra,* 31 Cal.3d at p. 843; *United States* v. *Perdue, supra,* 8 F.3d at p. 1467.) By contrast, when a defendant makes a motion to exclude coerced testimony of a third party on due process grounds, the burden of proving improper coercion is upon the defendant. (*Douglas, supra,* 50 Cal.3d at p. 500.) Even assuming an out-of-court statement of a third party was the product of improper pressures, it cannot be the rule that the burden rests on the People to demonstrate that the taint of this statement was purged by the time the witness testified. Rather, a defendant must demonstrate that trial testimony following the coercion of a witness was actually tainted thereby.

Testimony of third parties that is offered at trial should not be subject to exclusion unless the defendant demonstrates that improper coercion has impaired the reliability of the testimony. We believe, as federal courts have stated in the cases discussed above, that a witness's trial testimony is not *necessarily* unreliable simply because the witness was subject to improper pressures in making an earlier, out-of-court statement. (See, e.g., *Bradford* v. *Johnson, supra,* 354 F.Supp. at p. 1337 ["[t]his does not mean that incriminations of others coerced by torture necessarily poison all future [trial] testimony"].) Thus, it is not enough for a defendant who seeks to exclude trial testimony of a third party to allege that coercion was applied against the third party, producing an involuntary statement before trial. In order to state a claim of violation of his *own* due process rights, a defendant must also allege that the pretrial coercion was such that it would actually affect the reliability of the evidence to be presented at trial.[3]

■ Defendants urge that the Court of Appeal correctly determined that the standard "fruit of the poisonous tree" exclusionary rule should apply to

---

[3]This is not to say that evidence of earlier coercion is irrelevant to a claim that trial testimony is itself involuntary at the time it is given. In *Douglas* itself, we examined the effect that mistreatment of the third party witness during custody in Mexico would have on his trial testimony, observing that the statement produced by that mistreatment was not admitted at

exclude trial testimony when it is claimed a third party's extrajudicial statement has been coerced, relying upon *In re J. Clyde K.* (1987) 192 Cal.App.3d 710 [237 Cal.Rptr. 550] (*J. Clyde K.*). In that case, the court reversed a juvenile wardship finding because of an involuntary third party confession. According to the Court of Appeal, three juveniles were detained on suspicion of auto burglary and improper pressure was brought to bear against one of them, resulting in a confession. The charged youth later made inculpatory statements, as well. The court held that the trial court should have granted a motion to suppress the third party confession on the ground that it was involuntary, as well as any fruit of this confession—presumably referring to the charged minor's statement. The Court of Appeal held that "[t]he constitutionally mandated exclusion of a coerced confession and of evidence obtained as a result of that unlawfully obtained confession is equally applicable when introduction of the same evidence is sought at the trial of another." (*Id.* at p. 718.) The court essentially held that defendants may assert the Fifth Amendment rights of others simply by denominating the claim as one arising under the due process clause.

Of course, the case is not precisely analogous to the case before us, as the minor in *J. Clyde K.*, *supra*, 192 Cal.App.3d 710, sought to suppress statements to be introduced *at trial*, rather than to suppress the testimony of a witness on the ground that her testimony would be tainted by her own earlier involuntary statements. Nonetheless, it is clear that the Court of Appeal erred in *J. Clyde K.* when it asserted that the defendant's right to exclude his own involuntary statement and its fruits is coextensive with his right to exclude the involuntary statements of others and their fruits on due process grounds. As demonstrated above, our decision in *Douglas*, *supra*, 50 Cal.3d 468, establishes that defendants have a relatively limited right to exclude evidence on the ground it was involuntarily obtained from a third party, and that this right differs substantially from the right to exclude evidence under the Fifth Amendment. The interests to be served by exclusion under the due process clause require a determination that exclusion is necessary to avoid the presentation of unreliable evidence at trial.

Although the court in *J. Clyde K.*, *supra*, 192 Cal.App.3d 710, 718-720, acknowledged some of the federal opinions that formed the basis for our opinion in *Douglas*, *supra*, 50 Cal.3d 468, it failed to recognize their

---

trial, the threat of further mistreatment was absent, the witness's immunity agreement did not require him to repeat his earlier coerced statement, and the witness asserted that his trial testimony was voluntary. (*Douglas*, *supra*, 50 Cal.3d at pp. 502-503.) Similarly, in *Bradford v. Johnson*, *supra*, 354 F.Supp. 1331, it was significant to the court's decision that a third party witness's trial testimony was coerced that the witness had been subjected to beatings commencing before his arraignment and continuing until he confessed and implicated the defendant. (*Id.* at p. 1336.)

message that the defendant has only a limited right to exclude evidence on the basis of a claim that a third party has been subjected to improper pressures. Nor can the *J. Clyde K.* rule be justified as an independent state ground for exclusion of evidence; as we said in *Douglas*, it is federal law that applies to a claim for exclusion of third party evidence on the ground it was involuntarily obtained. (*Douglas, supra,* 50 Cal.3d at p. 501 ["[a]ny basis for excluding [third party] testimony must be found in a federal constitutional right personal to defendant"].) Accordingly, the court's decision in *J. Clyde K.* is disapproved to the extent it is inconsistent with this opinion.

### c. *Standard of Review*

■ The Court of Appeal determined that the trial court's failure to conduct an evidentiary hearing on defendant's *in limine* motion required reversal. We believe, however, that the entire record should be examined to determine whether defendants were actually deprived of due process because of the allegedly coerced testimony of the third party.

In *Douglas, supra,* 50 Cal.3d 468, we did not state what standard of appellate review is to be applied to a claim that coerced testimony of a third party was introduced at trial. We offered no deference, however, to the trial court's decision to admit the testimony, but instead examined the entire record, and most particularly the record of the witness's trial testimony, to determine whether, in our view, "admission of [the third party's] testimony deprived defendant of a fair trial." (*Id.* at p. 503.) Similarly, when we have reviewed claims that third party testimony was improperly admitted due to a coercive immunity agreement, we have also reviewed the entire record and reached an independent judgment whether the agreement was coercive and whether defendant was deprived of a fair trial thereby. (See *People v. Sully* (1991) 53 Cal.3d 1195, 1216-1218 [283 Cal.Rptr. 144, 812 P.2d 163]; *People v. Morris* (1991) 53 Cal.3d 152, 187-193 [279 Cal.Rptr. 720, 807 P.2d 949]; *People v. Garrison* (1989) 47 Cal.3d 746, 767-770 [254 Cal.Rptr. 257, 765 P.2d 419]; *People v. Adcox* (1988) 47 Cal.3d 207, 238-239 [253 Cal.Rptr. 55, 763 P.2d 906]; *People v. Allen* (1986) 42 Cal.3d 1222, 1248-1255 [232 Cal.Rptr. 849, 729 P.2d 115]; see also *People v. Medina* (1974) 41 Cal.App.3d 438, 450-455 [116 Cal.Rptr. 133]; cf. *People v. DeSantis* (1992) 2 Cal.4th 1198, 1219 [9 Cal.Rptr.2d 628, 831 P.2d 1210] [record of hearing on motion to exclude "supports the finding" the witness wished to testify truthfully].) The federal standard of review also seems to require the reviewing court to examine the record and make an independent determination whether admission of coerced testimony of a third party deprived the defendant of a fair trial. (See, e.g., *Wilcox v. Ford* (11th Cir. 1987) 813 F.2d

1140, 1148, fn. 15.) Finally, when the related question whether the defendant's *own* statements are voluntary is presented, the appellate courts also apply the independent review standard. (*People* v. *Mickey* (1991) 54 Cal.3d 612, 649 [286 Cal.Rptr. 801, 818 P.2d 84].)

Here, the Court of Appeal failed to focus on the question whether the third party's *trial testimony* was actually coerced in violation of defendants' due process rights. Rather, the court determined that because the trial court rejected defendants' *in limine* motion to exclude that testimony on the incorrect ground that defendants lacked standing to bring the motion, the failure to hold an evidentiary hearing on the *in limine* motion required the reversal of defendants' convictions as a matter of due process.

We conclude the Court of Appeal erred in this respect. Naturally, if the issue is not litigated below because the defendant has been precluded by an erroneous ruling on standing from attempting to carry his burden of demonstrating that third party testimony is coerced, there will not be an adequate record for the appellate court to review. Further, the People may not raise a new theory to justify the trial court's refusal to exclude evidence when the court's ruling was based on defendant's asserted lack of standing. (See, e.g., *People* v. *Ybarra* (1991) 233 Cal.App.3d 1353, 1363 [285 Cal.Rptr. 200].) To permit the People to raise such a new theory would " 'deny [defendant] a full and complete hearing on his suppression motion.' " (*Ibid.*, quoting *People* v. *Koury* (1980) 214 Cal.App.3d 676, 691 [262 Cal.Rptr. 870]; but see *People* v. *McPeters* (1992) 2 Cal.4th 1148, 1172 [9 Cal.Rptr.2d 834, 832 P.2d 146] [appropriate for this court to independently review correctness of trial court's decision that defendant lacks standing to raise Fourth Amendment claim when "the historical facts concerning standing are established by uncontradicted evidence"].)

These considerations are not present in this case, however, because the trial court not only permitted a full offer of proof of what evidence would be presented at the *in limine* hearing, but also invited defendants to demonstrate *to the jury* that Jasik's testimony was coerced. The trial court was of the view that defendants, while they had no right to exclude her testimony, did have the right to demonstrate to the jury that her testimony was unreliable because it was coerced.[4] Defendants accepted the invitation, as the record demonstrates. As defendants had a full opportunity to litigate the issue of the

---

[4]The record shows that at the hearing, the court stated: "your clients do not have standing to challenge the voluntariness of those statements in the sense of an exclusionary rule." Defense counsel responded: "I'd like to take some time now to make it a full offer of proof as to what the evidence would show if the Court allowed us to have a hearing." The court responded: "Okay. Let me just—you can do that, but keep in mind what I told you before. *I'm not saying that that can't come into evidence.* I'm saying you don't have standing to exclude

coercion of the witness, with the same motive and opportunity for cross-examination that would be present at an evidentiary hearing on an *in limine* motion, the trial court's failure to hold an evidentiary hearing on the motion was harmless from the point of view of the development of a full record.

Our review of this record would normally resolve any factual conflicts in the evidence favorably to the judgment below. (*People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961] [trial court findings, whether express or implied, upheld if supported by substantial evidence].) We may still resolve factual conflicts favorably to respondent as to the claim that the immunity agreement was coercive, as we have a trial court determination rejecting that claim in the context of a motion to strike the testimony. As to the remaining three asserted grounds for exclusion, even if we resolve factual conflicts in favor of the defendants, we can only conclude that no coercion affecting the witness's trial testimony can be found.

Accordingly, we will examine the entire record and make an independent determination whether the testimony of Retta Jasik was coerced, in violation of defendants' right to a fair trial.

### d. *Asserted Coercion of Jasik's Testimony*

#### i. *Unlawful Arrest*

As we noted above, defendants assert that Jasik's trial testimony should have been excluded in part because she was subject to an illegal arrest, claiming that under Penal Code section 830.1 and Welfare and Institutions Code section 626, Jasik should not have been arrested by a Santa Cruz police officer or transferred to Santa Cruz County for custody because the charged offense occurred in Santa Clara County.[5] They argue that the statements she made implicating defendants during custody were the product

---

the testimony except to the rather limited, and I use that advisedly because I think it's rather limited discretion I have under the hearsay—to the extent hearsay would come in to exclude hearsay as being unreliable. I don't know that that would apply in this case, but *I haven't done anything to limit your cross-examination of anyone as to the situations under which Miss Jasik was laboring when she made these statements.* I'm merely saying I don't believe you have standing to exclude that evidence, and I would assume that virtually all of the evidence that would be presented at an *in limine* hearing, you're going to cross-examine her and the officers." (Italics added.) Defense counsel agreed, though he stated that not all the evidence might be presented "for tactical reasons, purposes of the jury's attention span or whatever . . . . I appreciate that the Court's willing to give us the opportunity."

[5]Section 830.1, subdivision (a)(1), provides, in pertinent part, that peace officers have authority "[a]s to any public offense committed or which there is probable cause to believe has been committed *within the political subdivision which employs the peace officer.*" (Italics added.) Welfare and Institutions Code section 626 requires an officer who takes a juvenile

of an illegal arrest, and that Jasik's trial testimony was the fruit of the improperly obtained statement.

Assuming arguendo that Jasik's arrest technically violated these sections, we have already seen that defendants have no standing to complain that her extrajudicial statements were the fruit of an illegal arrest. The constitutional right to be free from unreasonable searches and seizures is a personal one that cannot be asserted vicariously. (*United States* v. *Payner, supra,* 447 U.S. 727, 731 [65 L.Ed.2d 468, 473-474]; *In re Lance W., supra,* 37 Cal.3d at p. 896 [state vicarious exclusionary rule abrogated by Cal. Const, art. I, § 28, subd. (d)].) If the fundamental constitutional right to be free from unreasonable searches and seizures cannot be asserted vicariously, we see no reason to permit defendants to assert vicariously the mere statutory limitations at stake here. (See, e.g., *People* v. *Solario* (1977) 19 Cal.3d 760, 763-764 [139 Cal.Rptr. 725, 566 P.2d 627] [burglar has no standing to assert statutory knock-notice requirements benefiting householder]; cf. *Wilson* v. *Arkansas* (1995) __ U.S. __ [131 L.Ed.2d 976, 115 S.Ct. 1914] [common law knock-notice principle part of Fourth Amendment reasonableness inquiry].)

We treat defendants' claim as cognizable because it is arguably based on a theory that the illegality of the arrest itself coerced Jasik's cooperation and later statements, which, in turn, she was forced to repeat at trial despite their unreliability. (See *People* v. *Llamas* (1991) 235 Cal.App.3d 441, 446 [286 Cal.Rptr. 467] [recognizing detention in violation of Fourth Amendment arguably could be coercive circumstance affecting third party consent to search].) Nonetheless, we do not believe that any mere technical violation alleged here had any coercive effect on the witness's statement, or more significantly, upon her trial testimony. The circumstances of her arrest were explored at trial through examination of Jasik herself, and of Mr. Pogue, the prosecutor's investigator. Defendants do not claim the police lacked probable cause to arrest Jasik. Any impropriety in holding Jasik in Santa Cruz County rather than Santa Clara County for criminal conduct she committed in Santa Clara has no bearing on the question whether statements she made to the police four days after her arrest were coerced or unreliable. Nothing would have prevented the same custodial interrogation that produced her statements from being conducted in Santa Clara County had she been held there, as defendants claim Penal Code section 830.1 and Welfare and Institutions Code section 626 required. And there is even less cause to think that the asserted improper locale of her custody somehow, after months free of custody, infected her trial testimony. Defendants chose to explore the circumstances of her arrest thoroughly at trial, yet we see no evidence that

into temporary custody to relinquish custody of the minor to the probation officer of the county in which the minor was taken into custody.

the locale of her detention had any effect upon her extrajudicial statement or her trial testimony.

### ii. *Promise of Leniency*

■ Defendants' next claim was that Jasik's postarrest statements to Officers Moore and Mansfield incriminating defendants were involuntary because they were the product of a promise of leniency. They claimed that these involuntary statements became the script for Jasik's trial testimony. In support of the claim that the statements were involuntary, they alleged that in the days following Jasik's arrest, Officer Moore told Jasik's mother that Jasik would be released from juvenile custody if she cooperated, and her mother conveyed this promise to Jasik, producing the young witness's extrajudicial statements implicating defendants.[6]

All immunized witnesses are offered some quid pro quo, usually an offer of leniency. We have never held, nor has any authority been offered in support of the proposition, that an offer of leniency in return for cooperation with the police renders a third party statement involuntary or eventual trial testimony coerced. On the contrary, in *People* v. *Allen, supra,* 42 Cal.3d 1222, 1252, we held that testimony given under an immunity agreement does not violate the defendant's right to a fair trial, if the grant of immunity is

---

[6]Even assuming a legal basis for defendants' claim exists, the asserted factual basis for it is slight. The question of what influence caused Jasik to make her extrajudicial statements was thoroughly litigated at trial. On direct examination, Jasik stated that initially she lied to the police because she was frightened for herself and for Chris Badgett, and she repeated this on cross-examination and redirect examination. She testified on direct examination that she told the police the substance of Chris's admissions to her, after talking to her mother, who told her she "had to tell the truth whether it hurt or not." The question of her motivation was explored exhaustively on cross-examination, producing testimony that she talked to the police in response to her mother's exhortation to tell the truth. Jasik also testified that her mother had flown from Texas to talk to Jasik, that the mother disliked Chris and wanted to get Jasik out of trouble, that Jasik wanted to get out of juvenile hall and go home with her mother. There was testimony that Jasik's mother rode with her from juvenile hall to the sheriff's department where Jasik was to be interviewed, and that Jasik was provided with a soft drink and cigarettes. Jasik testified she "wasn't going to say anything" until she talked to her mother. On redirect examination, she repeated that it was the conversation with her mother that influenced her to tell what she knew. The trial record indicates that Jasik decided to cooperate with the police while she was in jail because of a discussion she had with her mother, and not because of any discussion Jasik had with the authorities about her release. She responded to her mother's admonition to "tell the truth whether it hurt or not" and to "do the right thing." Although Jasik testified at trial that she knew her mother had talked to the police, and that her mother said Jasik could go home if she told the truth to the police, Jasik did not suggest that her mother conveyed any particular offer on the part of the police. Rather, she conveyed that it was her mother's moral influence that caused her to make the statement. Thus, we are not persuaded that a police offer of release produced Jasik's cooperation, even assuming the legal argument was persuasive.

made on condition the witness testifies fully and fairly. More recently, in *People* v. *Daniels* (1991) 52 Cal.3d 815, 862 [277 Cal.Rptr. 122, 802 P.2d 906], we commented that "we have frequently approved arrangements under which a witness who played a lesser part in the crime testifies for the prosecution in return for a plea to a less [serious] crime, or even total immunity." In that case, two witnesses helped the defendant escape and hide from the police and could have been charged as accessories. Our conclusion bears emphasis here: "There is nothing improper in confronting a suspect with the predicament he is in, or with an offer to refrain from prosecuting the suspect if he will cooperate with the police investigation." (*Id.* at p. 863; see also *Douglas*, *supra*, 50 Cal.3d at p. 502, fn. 7.)

If an offer of immunity is not considered coercive, then an offer of release from custody in return for cooperation likewise should not render a witness's statement coerced.

Furthermore, as we shall explain in connection with defendants' claim regarding the immunity agreement under which Jasik testified, Jasik did not feel compelled to testify in conformity with the statements defendants claim were coerced by the offer of release from custody. Thus defendants fail in the essential task of connecting the pressures brought to bear on the witness before trial with her ultimate trial testimony.

### iii. *Unethical Conduct*

Next, defendants claimed that Jasik's trial testimony should be excluded because she was subject to continuing overreaching and unethical conduct on the part of the investigating officer and the district attorney. Defendants claimed in their offer of proof that although Jasik was represented by Mr. Rich, the prosecution contacted her outside his presence. They asserted that when Rich secured Jasik's agreement to an interview with the defense team, the prosecutor sought to relieve Rich as counsel, and threatened Jasik with proceeding by way of grand jury indictment, where she would be unrepresented. Defendants also complained that Jasik was not represented during trial.

The allegation that the prosecution acted improperly with respect to Jasik's counsel was extensively explored at trial, through exhaustive examination of Jasik, Pogue, and Rich.

When the prosecution investigator talked to Jasik in Texas regarding new evidence about Chris Badgett's preoffense statements and his jacket, other matters were also discussed. The prosecution did not disclose these other

matters to the defense when it provided discovery regarding the interview. Jasik's counsel, Rich, objected to this omission, and made Jasik available for questioning by defense counsel. Apparently, the prosecutor believed this contact jeopardized the People's investigation into the question whether the brothers had committed other homicides. Despite her statement that she wished the interview to go forward, Danner, the prosecutor, insisted that Jasik be voir dired by the municipal court conducting the preliminary hearing. When she repeated her consent to the interview, and the court refused to stop it, Danner threatened to seek appellate review, and charged Rich with "undue influence" over his client. The same morning, the prosecutor moved the municipal court to have Rich discharged as Jasik's appointed counsel, but the motion was denied. That afternoon, the superior court relieved Rich as Jasik's appointed counsel at the prosecutor's request, having dismissed the juvenile charges pending against Jasik. The same afternoon, the prosecution investigator attempted to interview Jasik without her counsel, but was interrupted by the arrival of Rich, who had been retained to continue representing her. Rich was upset that the prosecution had contacted his client without his permission. Investigator Pogue testified that when Rich insisted on tape-recording the interview with Jasik, the prosecutor became irate, threatened to force Jasik to testify before a grand jury instead of at a preliminary hearing, and accused Jasik's counsel of obstructing justice.

The trial evidence confirmed that both Pogue and Danner wished to interview Jasik in the absence of her counsel so that her counsel could not convey information to the defense, and resisted Jasik's counsel when the latter sought to make her available to the defense for an interview. Both Pogue and Danner evidently wanted to talk to Jasik without the presence of her counsel because they believed the latter had improperly divulged the contents of earlier interviews to the defense.

As we have stated, defendants lack standing to argue that the authorities interfered with Jasik's Sixth Amendment right to counsel. To the extent their claim is cognizable because it alleged that the interference with her attorney-client relationship affected the reliability of Jasik's trial testimony, our review of the trial record indicates Jasik's testimony was unaffected by the posturing and maneuvering of the prosecutor, because, as Jasik testified, she simply failed to understand what the lawyers were arguing about. She explicitly testified that she did not feel threatened or pressured by the prosecutor's confrontations with her counsel. She understood that Rich was relieved as appointed counsel because the juvenile charges were dismissed. Further, the evidence shows that the prosecution was concerned not to affect Jasik's testimony, but to prevent what they considered to be premature

discovery for the defense. As Pogue testified, he and Danner were upset with Jasik's counsel not because of the content of her forthcoming testimony, but because they thought his disclosures to the defense might impair further investigation into whether the defendants were guilty of other uncharged crimes. They were not responding to any effort on the part of counsel to shield Jasik from further duties of cooperation, nor were they concerned that counsel would somehow affect or change her testimony.

Defendants point out that Rich ultimately withdrew as retained counsel, and that the trial court rejected Jasik's request for appointed counsel thereafter. They suggest the prosecutor's success in interfering with and ultimately ending Jasik's relationship with Rich was itself coercive of her trial testimony. We are not persuaded. Rich, who was retained for a nominal sum after the court relieved him as appointed counsel, withdrew, not because of any action on the part of the prosecution, but because defendants proposed to call him as a witness at trial. By this time no charges were pending against Jasik, and no authority has been provided, nor are we aware of any, that would suggest that in order to secure the defendant's due process rights, a person not charged with any crime, but who is simply to be called as an immunized witness, must be provided with appointed counsel. Naturally, Jasik could have retained another attorney had she wished.

We cannot conclude that the conduct of the prosecution team coerced Jasik's trial testimony.

### iv. *Immunity Agreement*

 Finally, and most significantly, defendants contend Jasik's trial testimony was the product of a coercive immunity agreement, in that the agreement required her to testify consistently with her earlier extrajudicial statements to the police. As to this claim, we have not only a full record, but a ruling from the trial court. Defendants made a motion to strike Jasik's testimony on this ground at the conclusion of the evidentiary portion of trial. The court rejected the claim, stating that the immunity agreement was ambiguous, and that Jasik's testimony did not in fact remain consistent with her first statements to the police. The court again invited defense counsel to concentrate in argument to the jury on the inconsistencies of Jasik's testimony and her bias and motive to lie, assuring counsel that they would be given a very broad scope to argue her lack of credibility arising from the immunity agreement.

The Court of Appeal did not decide whether the immunity agreement was in fact coercive, but observed that on remand, the court should reconsider the

point in connection with the hearing on defendants' motion to exclude Jasik's statements and testimony. It suggested, however, that the immunity agreement left Jasik unable to testify to a version of events that differed from her statements to the police.

 An immunity agreement that requires the witness to testify consistently with a previous statement to the police is deemed coercive, and testimony produced by such an agreement is subject to exclusion from evidence. As we declared in *People* v. *Allen*, *supra*, 42 Cal.3d at pages 1251-1252: " '[A] defendant is denied a fair trial if the prosecution's case depends substantially on accomplice testimony and the accomplice witness is placed, either by the prosecution or the court, under a strong compulsion to testify in a particular fashion.' [Citation.] Thus, when the accomplice is granted immunity subject to the condition that his testimony substantially conform to an earlier statement given to police [citation], or that his testimony result in defendant's conviction [citation], the accomplice's testimony is 'tainted beyond redemption' [citation] and its admission denies defendant a fair trial. On the other hand, although there is a certain degree of compulsion inherent in any plea agreement or grant of immunity, it is clear that an agreement requiring only that the witness testify fully and truthfully is valid." (Fn. omitted.)

 If the immunity agreement in this case had conditioned Jasik's immunity on an understanding that she would testify at trial consistently with her previous statements to the police, we would conclude that the trial court erred in rejecting the defense motion to exclude her testimony. Our review of the record, however, persuades us that although, as defendants claim, there was some mention of consistency in the initial understanding with respect to immunity at Jasik's juvenile court detention hearing, the agreement under which she actually testified did not contain such a condition. It is the latter agreement, of course, that is determinative of defendants' claim. (See *People* v. *Sully*, *supra*, 53 Cal.3d at p. 1216; *People* v. *Morris*, *supra*, 53 Cal.3d at p. 191.)

At Jasik's juvenile court detention hearing the parties and the court first discussed the question of Jasik's immunity. The record indicates that at this initial hearing the parties merely had an agreement to agree, and that immunity was not actually bestowed. Although the transcript shows the parties thought immunity was in some way dependent on the consistency of Jasik's preliminary hearing testimony with her earlier statements, the transcript also indicates that the immunity agreement was understood as a

tentative one.[7] The prosecution evidently proposed to offer Jasik full transactional immunity, but only conditionally. Apparently the conditions were never fulfilled, as she never received full transactional immunity. As we shall see, subsequent evidence shows an evolution of the immunity agreement under which Jasik actually testified at trial, and as we have noted, it is that agreement that is determinative here.

After Jasik returned to Texas and Rich told the prosecution she had additional evidence to disclose and attempted to arrange for a more specific grant of immunity, the district attorney sent the following letter confirming discussions with Jasik's counsel:

"This letter is to convey to you on behalf of your client, Retta Jasik . . . that she is in present possession of additional information concerning the case of People v. Badgett . . . which evidence is possibly relevant to the prosecution of the Badgett case.

"The purpose of this letter is to convey to you and your client that any statements concerning this additional evidence made to the District Attorney's Office, representatives including attorneys and inspectors, will not be used against her in the prosecution of 32 [Penal Code] or in the prosecution of any other crime with the exception of perjury, *should she testify under oath to these same statements.*

---

[7]For example, during the discussion the court stated: "You are talking about that she has been previously interviewed by law enforcement and that anticipating that the statement that she would make under oath being the truth is *consistent* with what she's previously related in the interview, that there would be a grant of immunity?" (Italics added.) The prosecutor agreed, then stated, "I may not be the one granting the immunity, but my office's intention is to grant her the immunity that will protect her from any charges in regard to this incident should she *testify truthfully as to what she has previously stated.*" (Italics added.) Later the prosecutor stated: "I think that I have a problem stating with specificity exactly what the terms of the immunity would be prior to her testimony. I believe that it would be fair to say that . . . should she *testify truthfully for what she's been previously interviewed with,* I certainly wouldn't have a problem with transactional and use immunity, but I have to say that I have not considered all the aspects of the grant of immunity and that would be done at the time that she testifies. [¶] I do not have the intention of prosecuting her on these charges should she—*should facts stay the way they are* and she testifies truthfully." (Italics added.) The court attempted to summarize, saying that, among other conditions, "[t]here will be a grant of immunity for *testimony which would be consistent with the statements that she's previously given to police* authorities: that there will be at that time also further discussions with respect to the extent of her immunity. . . . [I]t is the intent of the District Attorney if the facts be what they are and are *still consistent,* that ultimately she will be given both use and transactional immunity for her testimony." (Italics added.) Rich declared: [I]f in fact her statement to the police that she has already given *remains consistent* with the state of the evidence that may be developed between now and the time she testifies at the preliminary examination, that at that time if she were to testify at the statement she's giving at the preliminary examination and it was *not inconsistent* with what other evidence is developed, she would be given transactional immunity." (Italics added.)

"In addition, we make the same representation with regard to any physical evidence she is now in possession of and wishes to turn over to a District Attorney's representative. Namely, that she shall not be prosecuted for a crime, based on her physical possession of any piece of physical evidence she is about to turn over to a representative of the District Attorney's representative.

"We make these representations knowing she has already provided information to us by way of statements which makes her a material witness on the question of guilt in the People v. Badgett case. It should also be made clear that if we verify her statements and/or any other evidence presented to us, that we would intend to petition the court for a full grant of immunity pursuant to section 1324 of the Penal Code at the time of trial, or sooner if her testimony is needed for the purposes of a preliminary hearing or indictment." (Italics added.)

We see little indication in this letter that immunity was offered with a condition that Jasik testify consistently with her earlier statements. The italicized language, upon which defendants rely, refers not to testimony consistent with earlier statements, but to the additional evidence she was about to produce. Nor does it suggest to us that she must testify at trial consistently with the statements she was about to make, but that should she testify regarding the new matter, she would be given use immunity therefor.

At the first preliminary hearing in February 1990, the court and counsel agreed that Jasik was testifying under a grant of transactional immunity except for murder and perjury, and that, in addition, she had use immunity for her statements. Jasik's counsel noted the letter quoted above, and stated that the letter "spelled out a portion of the understanding that we've reached here today . . . that my client would be receiving full transactional immunity as for [Penal Code] 32 and 148 and use immunity as to anything that she testifies here in court or speaks about outside of court." At the second preliminary hearing, the prosecutor stated that the only condition of the immunity conferred at the first preliminary hearing was that Jasik tell the truth, and both Rich and Jasik concurred in this representation. *There was no mention of consistency.*

When trial commenced, further evidence regarding the immunity agreement appeared. At the *in limine* hearing on the question of the marital privilege, Jasik stated that she was testifying under a grant of full immunity for all charges except murder and perjury, with transactional immunity for her statements. There was no mention of consistency with earlier statements. The remainder of the evidence regarding her immunity agreement came out

through her testimony before the jury, as well as through the testimony of Rich and Pogue. Jasik testified repeatedly that her understanding of her immunity agreement was that she would get immunity for the juvenile charges formerly pending against her if she would agree to testify truthfully in court. She understood that she could still be prosecuted for murder or perjury, but that she had use immunity for her testimony. She denied that she had been instructed to testify in a particular manner, or to lie. She testified that it was not part of the immunity agreement that her testimony had to be consistent with what she had said to the police before, though she did say she understood her testimony should be consistent as long as it was the truth. She did not believe the copy of the letter from the district attorney to her counsel regarding immunity was the correct statement of her final immunity deal; rather, she believed the immunity was correctly stated at the first preliminary hearing. She did not fear losing her immunity if she had to correct a misstatement in a previous statement.

The district attorney's investigator, Pogue, also testified that he understood the initial immunity agreement was conditioned on Jasik's truthful testimony, but admitted there was some discussion on the record of consistent statements. He explained, "[w]e expected her to testify to what she said before if it was the truth." He testified that he had always stressed to Jasik that her testimony was to be truthful, and that she could correct previous misstatements.

We also have evidence of Jasik's counsel's interpretation of the immunity agreement. Jasik waived the attorney-client privilege (having consulted independent counsel), and the defense called Rich, who testified that the exact terms of the immunity agreement were not reached in the juvenile proceedings, but that the parties anticipated the agreement would be reached when Jasik testified at the preliminary hearing. He believed, however, that when she was to turn over the jacket in Texas, she needed a firm immunity agreement to cover the jacket and the statements she would make at the forthcoming interview. He believed that agreement was memorialized in the district attorney's letter, though he believed it was still possible she would eventually receive full transactional immunity. Rich testified that throughout the proceedings, it was part of the immunity agreement that Jasik testify truthfully, and during the time he represented her, the subject of changing her testimony never came up.

We conclude from this evidence that the issue of immunity was not settled at the juvenile detention hearing, and the statements of the court and counsel at that hearing merely outlined what the parties anticipated would be offered at the time of Jasik's actual testimony at the preliminary hearing. In addition,

we do not believe the letter sent by the district attorney created a "consistent statement" condition. As we have noted, the letter did not represent the full immunity agreement, but was evidently directed mostly at the new evidence to be received, including the physical evidence of Chris Badgett's jacket. In context, we believe the phrase "should she testify under oath to the same statements," merely meant that Jasik would be given use immunity for such new evidence as she was about to offer.

Even if the letter were interpreted to require testimony consistent with the statements about to be provided, the consistency requirement did not continue in effect. At the ensuing preliminary hearings, there was no further mention of the consistency requirement when the immunity agreement was discussed. That the agreement had changed since the time of the initial juvenile dependency agreement is clear. At the time of the first preliminary hearing, not only had the "consistent statement" element dropped out, but there was no longer any suggestion that Jasik would receive full transactional immunity.

Of most import, of course, is the evidence of the immunity agreement in effect at trial. Trial evidence demonstrated that Jasik thought her immunity agreement required her to tell the truth, that her statements should be consistent only to the extent that they were the truth, and that she was free to testify inconsistently with any earlier statement that had conveyed mistaken information. Both the prosecutor's investigator and Jasik's own counsel provided substantial evidence that the basic condition of her immunity agreement was that she tell the truth and that she was not bound to repeat her earlier testimony.

Finally, as the trial court stated in rejecting the defense motion, it is clear that Jasik actually did not feel bound by her immunity agreement to repeat her earlier statements. In fact, her trial testimony differed substantially from the statements she had made at the time the immunity agreement was discussed at the juvenile detention hearing. Most significantly, her original statements to Moore and Mansfield indicated she had no idea Chris Badgett might be contemplating murdering the victim when he left with him, and that it was not until later that she looked for Chris's gun. This version of events was contradicted by her later statement and testimony that Chris told her he was considering the murder before he left with the victim and that she was so concerned she checked for Chris's gun before he left. She admitted at trial she lied to Moore on this point and lied at the preliminary hearing when she said everything she told Moore was the truth. Her original statement was also inaccurate as to the times that various events occurred on the night of the murder.

Given the state of the evidence, we conclude Jasik did not testify at trial under an agreement conditioning her immunity on testimony consistent with earlier statements to the police. Having rejected the last element of defendants' claim that Jasik's testimony should have been excluded because it was coerced, we conclude on this full record that defendants can not carry their burden of proving coercion.

### 2. *Confidential Marital Communication Privilege*

 The next issue we consider is whether the Court of Appeal correctly determined that the privilege for confidential marital communications barred admission of Jasik's testimony regarding Chris Badgett's statements to her. The more significant of these statements, of course, were his preoffense statement that he wondered whether he should "off" the victim and his postoffense statements describing the murder to Jasik.

Evidence Code section 980 establishes a privilege for confidential communications between spouses: "[A] spouse . . . , whether or not a party, has a privilege during the marital relationship and afterwards to refuse to disclose, and to prevent another from disclosing, a communication if he claims the privilege and the communication was made in confidence between him and the other spouse while they were husband and wife."

The privilege applies only in the case of a valid marriage. (*People* v. *Mabry* (1969) 71 Cal.2d 430, 439 [78 Cal.Rptr. 655, 455 P.2d 759]; *People* v. *Delph* (1979) 94 Cal.App.3d 411, 415 [156 Cal.Rptr. 422, 4 A.L.R.4th 416].) Although California does not recognize common law marriages (see *Elden* v. *Sheldon* (1988) 46 Cal.3d 267, 275 [250 Cal.Rptr. 254, 758 P.2d 582]; *Marvin* v. *Marvin* (1976) 18 Cal.3d 660, 684, fn. 24 [134 Cal.Rptr. 815, 557 P.2d 106]), it does recognize the validity of a marriage contracted in another state that would be valid by the laws of that state. (Fam. Code, § 308.)

Defendant Chris Badgett claimed he had a valid common law marriage to Jasik under Texas law. Texas recognizes common law marriages, requiring a showing that the parties agreed to become husband and wife, that they were living together in Texas pursuant to the agreement, and that they held each other out to the public as husband and wife in Texas. (Tex. Fam. Code Ann., § 1.91(a)(2); *Hightower* v. *State* (Tex.Crim. 1981) 629 S.W.2d 920, 924.) The agreement to become husband and wife need not be express, but may be proved circumstantially from evidence the parties lived together as husband and wife and represented to others that they were married. (*Tompkins* v. *State* (Tex.Crim. 1987) 774 S.W.2d 195, 208-209.) Nonetheless, the agreement

must be specific and mutual. (*Gary* v. *Gary* (Tex.Civ.App. 1973) 490 S.W.2d 929, 932.) A claim of common law marriage is closely scrutinized by the courts (*Hightower* v. *State, supra,* 629 S.W.2d at p. 924), and " '[i]f the conduct of such contracting parties does not show clearly an honorable abiding by such agreement before the eyes of their world of associates and contacts, then it should not receive judicial sanction.' " (*Gary* v. *Gary, supra,* 490 S.W.2d at p. 935.)

The claimant of the marital privilege for confidential communications has the burden of proving, by a preponderance of the evidence, the facts necessary to sustain the claim. (*People* v. *Mickey, supra,* 54 Cal.3d at p. 655; see also *In re Glasco* (Tex.Civ.App. 1981) 619 S.W.2d 567, 571 [party asserting common law marriage has burden of proof]; *Faglie* v. *Williams* (Tex.Civ.App. 1978) 569 S.W.2d 557, 565 [same].) The question to be resolved is whether Jasik and Chris Badgett had a valid marriage under Texas law.[8]

At the hearing on the motion, Jasik testified that she and Chris Badgett agreed to live together as husband and wife when she was 17 and he 18, but that they had no formal agreement to that effect, and in fact, had never discussed it. She testified that they lived together in Chris's mother's home, paying no rent and making no contribution to household expenses. Jasik wore a wedding ring, but this ring had been given to her by her mother and was a family heirloom. She began wearing it before she moved in with Chris, when her mother first gave it to her. Chris also wore a wedding band. Although Jasik told a few people she was married to Chris, and filled in a hospital admittance form and rental applications noting herself as his wife, she did this because it was too complicated or not quite accurate to explain that they were just living together. While they lived together in Texas, she never told her parents or Chris's mother or any other relative or close friend that they were married. She stated that they did not actually get married because she was not ready for such a commitment and did not want to have to get a divorce if the relationship did not work out. Chris suggested to her after their arrest that if she said she was married to him, she would not have to testify against him, but her mother told her Chris's idea of a common law marriage between herself and Chris was "nonsense." Jasik's mother confirmed that Jasik never told her she was married to Chris, and the mother never considered them so.

---

[8]Because we determine the privilege does not apply in the absence of a valid marriage, we decline respondent's invitation to decide whether the communications were admissible because a valid common law marriage in another state does not serve the policy of the marital privilege in this state to support trusting relations between lawfully married persons. For the same reason, we also decline to decide whether the communications were admissible under exceptions to the privilege for confidential marital communications.

Defendant conceded at the hearing that the dispute was a factual one, and the trial court declared that its decision rested largely on an evaluation of Jasik's credibility at the hearing. Applying Texas law to the facts, the court concluded there was no common law marriage. The court reached this conclusion because, in its view, the facts showed Jasik and Chris Badgett did not have a serious agreement to be married, and because they had not sufficiently held themselves out as married. The Court of Appeal rejected this determination, holding that the trial court found there was no common law marriage under the mistaken belief that Texas law required an express agreement.

The assertion of the Court of Appeal that the trial court erred as a matter of Texas law is not supported by the record. According to the Court of Appeal, the trial court found the parties had held themselves out as married but assumed that Texas law required, in addition, an express agreement to marry. The record demonstrates no such error of law. Rather, the trial court found that an agreement would not be *inferred* from the other evidence because of the relative paucity and weakness of such other evidence. The court declared: "[In finding no agreement] I'm influenced by the nature in which they held out or failed to hold out their purported relationship to various people. It seems to me that if people . . . have entered into a marital relationship and they intend it to be a marriage in the sense that the law recognizes, that it is not only a private relationship but a public relationship, as well. They're going to have discussed at least at some point this relationship with someone close to them. There was going to be some member of the family, some relative, some high school friend, someone who could come forward and say there was a discussion . . . about this relationship. There is no such individual that I'm aware of, and, indeed, it appears that the parties intentionally failed to disclose whatever their relationship was to anyone they were close to." Contrary to the assertion of the Court of Appeal, the court also declared that even if there was an agreement between Jasik and Chris to be married, there was insufficient evidence of "holding out" to warrant a conclusion there was a valid marriage under Texas law.

We see no error of law. The trial court displayed an accurate understanding of Texas law, and correctly sought to determine whether an agreement to be married could be inferred from the evidence that the parties held themselves out as married. Nor do we see any abuse of discretion in the trial court's primarily factual determinations as to whether there was an agreement to be married and whether the parties actually held themselves out as married. (See *People* v. *Mickey, supra,* 54 Cal.3d at pp. 654, 655.) It is clear that there was no specific agreement to marry, and the evidence that the couple held themselves out as married was weak and ambiguous. Keeping in

mind that the burden of proof was on the party seeking to exercise the privilege (*id.* at p. 655), there was little evidence from which an agreement to marry could be inferred. As the trial court pointed out, the couple did not inform their parents of the "marriage" even though they lived with Chris's mother, nor did they hold themselves out as married to any other relative or close friend while they were in Texas. This omission, in combination with Jasik's statement that they did not actually marry because she feared the commitment and did not want to go to the trouble of divorce if the relationship did not work out, provide overwhelming support for the trial court's factual determinations.

Accordingly, we reject the Court of Appeal's holding that the trial court erred in failing to exclude Jasik's testimony regarding Chris's statements to her.

### CONCLUSION

The judgment of the Court of Appeal is reversed and the matter is remanded to the Court of Appeal for further proceedings not inconsistent with this opinion.

Kennard, J., Arabian, J., Baxter, J., George, J., and Werdegar, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I agree with the majority's reasoning and conclusions regarding the nature and scope of a criminal defendant's Fifth and Fourteenth Amendment right to object *in limine* to the admission of a third party witness's testimony on the ground that testimony would be involuntary and therefore inherently unreliable. (Maj. opn., *ante,* pts. 1(a) & 1(b), pp. 342-349.) I also agree with the majority's analysis of the marital privilege. (Maj. opn., *ante,* pt. 2, pp. 362-365.) I cannot join with the majority, however, in concluding that the trial court's denial of defendants' motion *in limine* to exclude Henrietta Jasik's assertedly involuntary testimony was harmless error as a matter of law.

A reviewing court must ordinarily use a two-part error analysis in cases like the one at bar. First, it must independently review the record to determine whether the trial court was correct to conclude that the witness's in-court testimony would be voluntary. (See *People* v. *Mickey* (1991) 54 Cal.3d 612, 649 [286 Cal.Rptr. 801, 818 P.2d 84].) Second, if the trial court's finding was error, it must decide whether the error was harmless beyond a reasonable doubt. (See *Arizona* v. *Fulminante* (1991) 499 U.S. 279, 306-312 [113 L.Ed.2d 302, 328-333, 111 S.Ct. 1246]; *People* v. *Cahill* (1993) 5 Cal.4th 478, 510 [20 Cal.Rptr.2d 582, 853 P.2d 1037].)

This case is somewhat unusual because the trial court did not determine whether Jasik's in-court testimony would be voluntary when it ruled on the motion *in limine*; instead, it denied the motion because of its erroneous conclusion that defendants lacked standing. The trial court partially cured this error—*but only partially*—when it ruled on defendants' posttrial motion to strike Jasik's testimony on the ground that it was the product of a coercive immunity agreement. (See, e.g., *People* v. *Medina* (1974) 41 Cal.App.3d 438, 450-455 [116 Cal.Rptr. 133].) In denying the motion to strike, the trial court expressly found that the immunity agreement did not render Jasik's testimony "incredible," i.e., inherently unreliable, and that it was not even a "terribly close" question. This finding survives independent review for the reasons stated by the majority. (Maj. opn., *ante*, pt. 1.d.iv., pp. 357-362.)

The trial court made no express or implied finding regarding the three additional contentions defendants raised in their motion *in limine*—that Jasik's testimony would be involuntary, and therefore inherently unreliable, because of her unlawful arrest, the promise of leniency, and the unethical conduct of the district attorney and the police investigator. In the absence of an express or implied finding by the trial court, independent review is impossible for the simple reason that we, as a reviewing court, have nothing to review. Nor is it possible to assume arguendo that Jasik's testimony was involuntary but conclude that its admission, if error, was harmless beyond a reasonable doubt given the other evidence in the case. Indeed, the trial court itself stated during the hearing on the motion to strike that without Jasik's testimony there was not enough evidence to justify sending the case to the jury.

Under such circumstances, a reviewing court has only two principled options: if the evidence was fully developed below and, in light of all of the evidence, no rational trier of fact could have found that the witness's testimony would be involuntary, it can conclude as a matter of law that the admission of the testimony was not error. Although this appears to be what the majority have done here (see maj. opn., *ante*, pts. 1.c. & 1.d.i-iii, pp. 349-357), I believe that they were wrong to do so, because a rational fact finder could have concluded that Jasik's testimony was involuntary.

We are therefore left with only one option: to instruct the Court of Appeal to remand the cause to the superior court with directions to determine whether Jasik's testimony was voluntary. Because the majority has declined to do so, I cannot join in their disposition of this case.