Filed 7/18/13  P. v. Trammell CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY AVILEZ TRAMMELL,<br><br>Defendant and Appellant. | F062485<br><br>(Super. Ct. No. MF50302)<br><br><br>OPINION |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Ronald W. Hansen, Judge.

Stephen Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and Craig S. Meyers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

On November 24, 2008, at about 10:30 p.m., Randall Armendariz, an employee of Performance Towing and Transport, was shot and killed when he apparently confronted a person he suspected had stolen his employer's white, 1989 Chevrolet service truck earlier that day.  Defendant Anthony Avilez Trammell was charged with the murder of

Armendariz.  After a jury trial, defendant was convicted of first degree murder (Pen. Code,[1] § 187, subd. (a); count 1) with the special circumstance of committing the murder in furtherance of a criminal street gang (§ 190.2, subd. (a)(22)), two counts of possession of a firearm by a felon (formerly § 12021, subd. (a), presently § 29800, subd. (b); counts 2 & 4), receiving stolen property (§ 496, subd. (a); count 3), exhibiting a firearm to a peace officer to resist arrest (§ 417.8; count 5), and being an active participant in a criminal street gang (§ 186.22, subd. (a); count 6).  In addition, the jury found true the special allegations that defendant was an active participant in a criminal street gang (§ 186.22, subd. (b)(1)), and that he personally discharged a firearm in the commission of the murder (§ 12022.53, subd. (d)).  Subsequently, defendant admitted he had suffered a prior strike within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).  The trial court sentenced defendant to a term of life without the possibility of parole on the murder charge in addition to a consecutive 22-year determinate term.[2]

On appeal defendant contends the trial court erred in admitting a witness's taped statement to the police, claiming the statement was coerced.  Additionally, he claims (1) the court erred in calculating his sentence under the three strikes law, (2) his sentence for being an active participant in a street gang should be stayed, (3) the court miscalculated his conduct credits, and (4) the court erroneously imposed a parole revocation fine.  We

---

[1]All further references are to the Penal Code unless otherwise indicated.

[2]The court calculated defendant's sentence as follows.  On count 5, the court selected the midterm of three years and added the midterm of three years for the enhancement.  The court then doubled the entire sentence pursuant to three strikes for a total of 12 years on count 5.  On count 6, the court imposed one third the midterm consecutively, doubled, for a total term of one year four months.  On counts 2 and 3, the court imposed eight months (one third the midterm) for each count plus an additional one year (one third the midterm) for the enhancement.  The court then doubled the sum for a total of three years four months consecutive on each count.  The court imposed and stayed an identical term on count 4.  In addition, the trial court sentenced defendant on three violation of probation cases.  The court imposed a consecutive eight-month (one third the midterm) sentence on each case, resulting in an additional two years.

agree defendant's sentence was miscalculated, that the gang participation count must be stayed and that he is entitled to additional conduct credits and will modify the judgment accordingly. We find defendant's remaining contentions without merit and affirm the judgment as modified.

## FACTS

On November 15, 2008, Lee Winzer's gray 1992 Chevrolet Lumina was stolen. The car was missing the trunk lock. On November 24, 2008, a Performance Towing and Transport truck was stolen sometime after 6:00 or 7:00 p.m. The truck was a white 1989 Chevrolet service truck with metal toolboxes affixed to the passenger side of the bed. The truck had magnetic signs on the doors with the name of the business. The truck was stocked with tools and equipment, had a very loud muffler noise, and the ignition turned without a key. Upon learning the truck was stolen, the owner of the business, Brian Thompson, informed his employees of the theft. He instructed his employees, including the victim, Randall Armendariz, to notify law enforcement if they located the vehicle.

That same night, defendant arrived at Alejandro Uriostegui's home. Uriostegui lived in a small converted storage shed behind his mother's house in Merced. A friend of Uriostegui's, Christine Smythe, was present at the house when defendant arrived. Uriostegui, who was a longtime friend of defendant, noted he arrived in a white service pickup truck that had toolboxes affixed to the bed. The truck was loud. Defendant was with another person, who was driving the truck, that Uriostegui did not know. During the visit, defendant sold Uriostegui some hand tools for $20 to $30. Uriostegui denied exchanging methamphetamine for the tools. Uriostegui did not know if defendant had a gun with him at the time. Uriostegui identified the truck as the Performance Towing and Transport truck that had been stolen. November 24, 2008, was a Monday. During the time period in question, defendant visited Uriostegui daily or every other day.

Smythe testified that on November 24, 2008, she was visiting Uriostegui at his home. She described Uriostegui as her ex-boyfriend and a drug dealer who provided her

3.

with methamphetamine. Sometime between 9:00 and 10:00 p.m. that night defendant, whom she knew as "Red," arrived in a very loud vehicle. At some point, Smythe heard the vehicle drive away. She never saw the vehicle, she just heard it arrive and leave.

While at Uriostegui's house, defendant talked to Uriostegui about being in a high-speed chase and "GTA'ing" over the weekend. "GTA" meant grand theft auto. Uriostegui gave defendant some methamphetamine, which he smoked. During the visit, defendant made a phone call and asked when "they" would come get him. Sometime later, the vehicle returned to the house, and defendant brought in a toolbox with tools that he and Uriostegui inspected. Uriostegui gave defendant some methamphetamine for the tools. Before leaving, defendant retrieved a revolver from under a couch and put it in his pocket. When defendant left, she heard the loud vehicle drive away.

Robert White was at his home in the vicinity of Carmel Road and Ruby Avenue in Merced that same evening. At about 10:30 p.m., White was in his driveway when he noticed two vehicles down the street that appeared to be drag racing. One was a pickup truck and the other was an SUV, possibly a Jeep. The SUV appeared to cut off the pickup in a cul-de-sac, and the two vehicles stopped. He saw two people running around, one chasing the other, and yelling angrily after the vehicles stopped. A few minutes later a dark colored midsize sedan pulled up behind the other two vehicles. Someone exited that car, walked around in front of the car, and then walked back. He then extended his arm and fired a shot. White did not see if anyone was hit by the shot as he went back into his home. He could not describe the shooter other than to say that it was a slender young male with short hair.

Todd Latronica lived on Ruby Avenue at the time. Sometime around 10:30 p.m., Latronica heard a commotion outside of his home. He looked outside and saw headlights from two vehicles pointing directly at his house. Latronica then continued watching television when his wife told him she thought there had been an accident outside. He looked out again and saw a car speed away. The vehicle was a light colored small import

4.

car, similar to a Toyota or Honda. He went outside and found a man lying on the ground in front of the vehicles with a bullet hole to his head. The two vehicles, a white pickup and a tan Jeep Cherokee were still outside of his home.

The victim, who was identified as Armendariz, was pronounced dead at the scene. He died from a gunshot wound to the forehead. The victim had been shot one time and there was no exit wound.

That same evening, Charles Rusticus was walking on Carol Avenue when a car sped past at a high rate of speed. He noted the car was traveling erratically; it almost hit him, and it ran a stop sign. The car was a gray Chevrolet Lumina and was missing the trunk lock. Shortly after the car sped by, Rusticus heard a number of sirens. He continued on his way and later came upon the murder scene on Ruby Avenue.

At 11:07 p.m., Merced police officer Peter Villarreal was dispatched to a suspicious vehicle in an alley. He arrived on scene seven to eight minutes after the call and found a silver Chevrolet Lumina that had been reported stolen. The hood of the car was still warm and the officer noticed the ignition was pulled from the steering column. In the course of his investigation, he located some fingerprints from the exterior of the driver's side door of the car. The latent prints matched defendant's. Winzer identified the vehicle as his. The car was located in an alley in front of the home of defendant's cousin and good friend, Roy Maule. Maule is a Norteño gang member.

Thompson, the owner of Performance Towing and Transport, arrived at the scene of the murder on Ruby Avenue and identified the service truck as belonging to the company. He was also able to identify the victim's Jeep at the scene as well as the victim. Upon inspecting the truck after its recovery, Thompson noted the tools, equipment, and magnetic signs were missing from the truck.

Uriostegui testified that he heard of the murder on the following day. He learned of the incident from some people who lived down the street from his home. Defendant was present at the time and part of the discussion; however, Uriostegui denied that

5.

defendant said anything to him about being involved in the murder or shooting the victim. Uriostegui also denied ever telling Merced police detective John Fister that defendant had admitted any part in the murder.

On November 26, 2008, Merced police officer Jobe Sandhagen, a member of the gang suppression unit, attempted to locate defendant for questioning in association with the murder. Officer Sandhagen was informed that defendant was a gang member and possibly armed with a handgun. The officer, along with another officer, began surveillance on Uriostegui's home and determined defendant was present at the home. Subsequently, a team of officers arrived to take defendant into custody.

Prior to entering the residence, Officer Sandhagen put on a blue tactical vest with the word "POLICE" on it. The officers approached the garage area in the back of the house and noticed the door was open but the doorway was covered by a curtain. There was an approximately two foot gap between the curtain and the ground, so the officer squatted down to peer inside the room. After seeing defendant inside the room, he began to pull the curtain back. He then saw defendant sitting or lying on a bed or couch holding a revolver pointed directly at the officer's face. Seeing that the gun was at least partially loaded, Officer Sandhagen began firing at defendant while stepping backwards. Other officers began firing as well. Defendant did not fire his weapon. Officer Sandhagen did not recall if he announced his presence prior to the shooting, but other officers recalled hearing the announcement prior to the gunshots. Defendant suffered numerous gunshot wounds and was transported to the hospital by ambulance.

Linda Hernandez was visiting Uriostegui on the day of the police shooting. She was sitting next to defendant in the garage when she heard officers yell "Merced Police Department, search warrant, put your hands up." Then the police started shooting, hitting defendant. She did not see a gun in defendant's hand, however, she did see a gun on the bed where he had been sitting.

6.

A .38 special Colt revolver was found in the garage on the mattress where defendant was sitting prior to the shooting. The gun was loaded with two rounds. According to firearms expert George Luczy, the gun recovered could have fired the bullet that killed the victim. Upon examination of the bullet removed from the victim, Luczy determined the bullet was a .38-caliber. The recovered bullet did not have enough detail to provide a conclusive match, but it did show a pattern of six lands and grooves with a left-hand twist with dimensions that matched a Colt firearm. There are a number of Colt models that could have fired the bullet.

After the shooting, Detective Fister assisted in a search of the converted bedroom where Uriostegui was living. In that house he found a .22-caliber revolver under a cushion on the couch. Tools and toolboxes were also discovered in the garage area. Sometime later he showed these tools to Gonzalo Curiel, an employee of Performance Towing and Transport. The recovered truck had been assigned to Curiel and he was able to identify the recovered tools and toolboxes as items that had been taken from the truck.

Detective Fister testified that he, along with Detective Chris Russell, interviewed Uriostegui on November 26, 2008. The interview was videotaped and was played for the jury.[3] In the recorded interview, Uriostegui initially denied defendant had said anything to him about a murder. However, Uriostegui ultimately admitted defendant had told him about the murder the day after it occurred. He stated defendant told him someone had a stolen "RTS" truck and defendant was in a stolen car and somehow they "bumped heads" with the victim. Defendant said he was there with two friends when the victim "tried to run up" on defendant's friend and "that's what happened." When Detective Fister asked if defendant walked up and shot at that point, Uriostegui nodded. Upon further questioning, Uriostegui stated that defendant was behind the truck and they stopped and the victim "started talking shit" to them and was "walking up on his homeboy" and

_____

[3]As defendant challenges the admission of this recorded statement, a more complete discussion of the statement is provided below.

7.

defendant was right behind the victim and shot him. Defendant then said they just got into the car and left.

Uriostegui stated he had not believed defendant's story and thought he was just trying to show off. Uriostegui did not believe what defendant told him because defendant said the truck he arrived in on Monday was the same truck involved in the murder, but he described it as an "RTS" truck.

During his trial testimony, Uriostegui denied that defendant ever told him anything about a murder or that he ever admitted killing someone over a truck. Uriostegui also denied ever making those statements to Detective Fister. Uriostegui testified that he "hung around" Norteño gang members in November of 2008. According to Smythe, she knew Uriostegui to affiliate with the "NFL," Norteño For Life, gang. During that time frame, Norteño gang members would come to his house and use methamphetamine. Uriostegui admitted during the taped interview that he was a Norteño For Life gang member "from the heart."

In an interview with Detective Fister a few days after the police shooting, defendant admitted he was a Norteño gang member. The detective did not ask defendant about the murder nor did defendant provide any information about the murder. The detective only inquired as to the police shooting. When asked, defendant denied selling any items to Uriostegui before the police shooting. Defendant claimed he had found the firearm he was holding on the day of the police shooting. Regarding the shooting, defendant told Detective Fister something to the effect that he remembered thinking to himself that the police were there and he had a gun in his hand.

DNA samples taken from the steering wheel and driver's door handle of the Performance Towing and Transport truck did not match defendant. Samples taken from the passenger side of the truck were never tested.

Merced police detective Joseph Deliman testified as a gang expert. The Norteño street gang is prevalent in Merced and associates with the color red and the number 14.

8.

The gang's primary activities include thefts, vehicle thefts, burglaries, robberies, homicides, shootings, drive-by shootings, and drug crimes. Gang members often carry weapons to facilitate their criminal activities and to intimidate others. Loyalty is very important to gang members, as is fear, respect, and intimidation. Norteño gang members demand respect from others, including people in the community. If a gang member feels he has been disrespected, he would react violently. Gang members instill fear and intimidation into the community as a way to carry on their criminal activities and to prevent others from reporting their crimes to police or to testify in court.

Detective Deliman assisted with the search of the converted bedroom at Uriostegui's home. In the room he found several items with gang graffiti that one would find at a Norteño gang house.

After reviewing reports involving some of defendant's contacts with the police where he admitted gang membership, pictures of gang tattoos on his body, and defendant's prior convictions for gang-related offenses, Detective Deliman opined that defendant was a Norteño gang member at the time of the offenses. He noted that confronting a police officer with a gun would bolster a gang member's reputation and also the reputation of his gang. Similarly, a gang member's possession of a firearm benefits the gang by instilling fear and intimidation in others, thereby increasing the reputation of the gang. Likewise, stealing cars benefits the gang as it allows gang members to commit crimes while concealing their identity. Dealing in stolen property also benefits the gang by bringing in money for the gang. Further, Detective Deliman testified a gang member can rise within the gang hierarchy by committing a homicide.

Detective Deliman opined that a homicide committed by a gang member (1) who sees one of his "homeboys"[4] with a stolen vehicle, cornered by an unarmed civilian, and (2) who then obtains a firearm and shoots the civilian and escapes with his homeboy in

[4]Detective Deliman defined the term "homie" or "homeboy" as someone who is close to a gang member, a person he trusts.

9.

yet another stolen vehicle would benefit the street gang. The gang member would be required to act in that situation to protect his fellow gang member or homeboy. In addition, killing the civilian would benefit the gang by removing an eyewitness to the crime as well as instilling fear and intimidation in the community thereby improving the gang's reputation.

## DISCUSSION

### I.      Uriostegui's Statement Was Properly Admitted

Defendant contends the trial court erred in admitting Uriostegui's videotaped statement, claiming it was the product of unlawful police coercion and, therefore, inadmissible. We disagree.

*The Interview*

After the shooting at Uriostegui's home, Uriostegui was taken into custody. That evening, he was interviewed by Detectives Fister and Russell. The interview began with the detectives informing Uriostegui defendant was out of surgery and in stable condition. They also informed Uriostegui the rest of his family had been interviewed and released, they were still processing the house, and they had found some methamphetamine, his identification, a gun, and some gang indicia in the small house in the back. The detectives told Uriostegui they just wanted the truth from him, and as long as he told the truth "we're probably not gonna have any problems, okay? Anything we found in the house can be worked out because we're here … after a bigger squirrel, okay? I'm not worried about charging you with the gun. Uh, if need be then, you know, so be it. Um, but I would rather just get the truth from ya. Um, I'm not asking you to snitch nobody off, okay?"

Before going any further into the interview, Detective Fister read Uriostegui his *Miranda*[5] rights. Next, the detective questioned Uriostegui about what he saw before the

---

[5]*Miranda v. Arizona* (1966) 384 U.S. 436.

10.

shooting with the police. Then the interview progressed to questions involving when Uriostegui last saw defendant before the police shooting. Uriostegui explained he had seen defendant daily for the preceding three days. He also explained he had previously seen defendant with a gun and described it for the detectives. They discussed what time Uriostegui saw defendant on Monday night, who was there, and how defendant arrived. Uriostegui said defendant arrived in a white landscaping or maintenance truck with toolboxes affixed to the side of the truck. Defendant was with two other men.

Uriostegui mentioned defendant sold him some tools that night and described them as well as what kind of toolbox they were in. He continued to answer questions about defendant, the next time he saw him after Monday, and the circumstances of that visit. The detectives confronted Uriostegui, asking if defendant told him what happened on Monday night but Uriostegui denied knowing anything. Uriostegui then admitted he had heard of a shooting occurring on Monday night, claiming he just heard about it from people on the street.

Detective Russell informed Uriostegui he thought he was being honest with them and began confronting Uriostegui with the facts they knew at the time. Detective Fister noted Uriostegui was being "pretty truthful" although he appeared to be answering the questions "very carefully." He explained how they were investigating a homicide and how the facts they had at the time suggested Uriostegui was facilitating defendant in the homicide in some manner. Russell explained that assisting someone after a homicide could result in him going "to prison for a very long time." He explained defendant had been caught in Uriostegui's home just days after a murder, with a gun the detectives believed would prove to be the murder weapon. In addition, defendant had arrived in a stolen truck that the shooting victim had been looking for, and Uriostegui had bought tools from that truck. The detectives explained Uriostegui had things going for him in his life, while it appeared defendant was going to go to prison for the rest of his life.

11.

Detective Russell noted "the problem here is this is a gang-related offense, mm-kay?  Uh, you have a past history, you know?  There's indicia in your house.  There's a gun in your house.  And you're—I'm just talking about you now, okay?  And facilitating this cry—this—this homicide, you might be looking at at least 10 years for the gun."  He then clarified that was with the gang enhancement and for a loaded gun.  He continued, "And now I think it's time to come clean and be honest and alleviate yourself.  Because you can either be a witness or a suspect.  It's as simple as that."  Defendant, they explained, had already made his choice.  The discussion digressed to whether defendant had told Uriostegui about stealing cars the previous weekend, and Uriostegui acknowledged that he had.

The detectives came back to the situation at hand, explaining this would be the only opportunity Uriostegui would have to talk to them, and that "unfortunately your—your path got crossed.  And we found stuff there.  And we knew that [defendant] was at your house.  And we knew he's been at your house.  Um, and the fact of the matter is, I mean you got caught up."  Detective Fister explained, "But as long as you tell the truth, 'cause I—I feel you're holding back stuff uh, there's no reason you shouldn't go home tonight.  But I don't feel you're being totally truthful.  I've been doing this 34 years.  Um, there's some things you're holding back that are important to us in the investigation.  And I—and we need that.  To be upfront with ya, we don't need it to prosecute [defendant]."

Detective Fister clarified:

> "And I'm not saying the stuff, the files might not be charged, you know, with the DA's office or with paper or whatever but uh, if I leave here—and correct me if I'm wrong 'cause we're in this together uh, I can't justify, in my mind, with what's happened if you're not being truthful that you just, you know, just shouldn't be arrested for the dope and the gun and everything else, okay?  And I'm just being forthright with you, bud.  I'm not uh, cutting any corners.  And correct me if I'm wrong.  I mean I don't—I'll have to clare [*sic*] it with the sarge.  But uh, I just don't feel you're being totally upfront with what you know."

The detectives explained Uriostegui did not need to worry that his statement would incriminate him if he was not present at the scene of the murder and did not commit the murder. Under that situation, he "should be free gratis." At that point, Uriostegui stated defendant brags about "everything" but he did not say anything about a murder, and before the police arrived that day, Uriostegui told defendant he needed to be careful who he talked to as there was always someone watching.

Detective Fister responded:

"Well there's something you're not telling us though, Alex. And I—and I just would like to know what it is. I've been doing this too long not to—not to realize when somebody's, you know, you're telling the truth mostly. But you're leaving stuff out. And I just want to know about the stuff you're leaving out 'cause it must be important to you, okay? Otherwise you wouldn't be so upset. And I'd just like to know what that is. You want me to turn the recorder off?"

Uriostegui replied, "I'm scared. I'm scared of that." The detectives explained he was "between a rock and a hard spot" but he had to decide what was more important to him, spending time "behind bars for quite some—quite some time for a guy who didn't think twice to come over to your house and involve you in this or, you know, having a life with a—a family on this side of the the—the—the fence. And uh, and—and being free." After being told that prison "ain't the place to be," Uriostegui stated defendant might have mentioned something to him. Uriostegui told the detectives defendant had said something to the effect of someone had stolen an "RTS" truck and defendant was in a stolen car, and somehow defendant had "bumped heads" with the victim. Uriostegui claimed he did not believe defendant, that he was just bragging. He continued saying defendant was with two friends and the victim had "tried to run up on his friend. And that's what happened." When Detective Russell asked if defendant shot the victim, Uriostegui nodded. Additionally, when asked if defendant bragged about it, Uriostegui replied "the way it sounded to me was like he was trying to show off."

13.

Detective Fister then asked Uriostegui for details on what exactly defendant said regarding how he walked up to the victim and whether the victim confronted defendant with any weapons. Fister reiterated they wanted to give the victim's family some closure by telling them what happened, and he stated Uriostegui's name did not have to come up. Uriostegui questioned this and the detectives explained his name would be in the report regardless of what happened. Uriostegui motioned toward the digital recorder, and Detective Fister told him that if it would make Uriostegui feel better he would turn it off, but they still had to document the conversation "word by word." After he was told the recorder was off, Uriostegui asked, "So you guys gonna pay my … ticket out of Merced too?" and Detective Russell replied, "If need be, we can help ya out, absolutely." At that point Uriostegui provided additional details regarding defendant's statement.

He stated defendant was behind the truck and they stopped and the victim "started talking shit" to them and was "walking up on his homeboy" and defendant was right behind the victim and shot him. Defendant then said they just got into the car and left. Uriostegui stated he did not believe defendant's story and thought he was just trying to show off. Uriostegui did not believe what defendant told him because defendant had told Uriostegui the truck he arrived in on Monday was the same truck that was involved in the murder, but he described it as an "RTS" truck.

### The Trial Court's Ruling

After reviewing the video, the trial court found the interview was not coercive. First, the court found there were no signs Uriostegui appeared sleep deprived, and he had been provided food, water, and other necessities. Uriostegui did not appear to be too uncomfortable or tired to exercise his free will. Second, the trial court noted the detectives did make statements to Uriostegui regarding circumstances that could lead one to find he was an accessory after the fact to the homicide, however, such comments merely pointed out the realities of the situation Uriostegui faced at the time. Third, there was no promise charges would not be filed, and the detectives continually encouraged

14.

Uriostegui to tell the truth. As to any promise of leniency, the only statement was that Uriostegui would not be arrested that night, which the trial court was not sure could be considered a promise of leniency. In addition, the court found Uriostegui was not just parroting back what the detectives wanted him to say. Ultimately the trial court found there was nothing in the interview that overcame Uriostegui's free will in making the statement, thus the statement was voluntary.

*Analysis*

The law regarding involuntary statements is well settled. "A criminal conviction may not be founded upon an involuntary confession." (*People v. Williams* (2010) 49 Cal.4th 405, 436.) While the prosecution must prove, by a preponderance of the evidence, that a defendant's confession was voluntary (*ibid.*), a different rule applies when the inculpatory statement is provided by a third party witness. When a defendant seeks to exclude coerced testimony of a witness, it is the defendant's burden to establish the statement was involuntary. (*People v. Douglas* (1990) 50 Cal.3d 468, 500, overruled on other grounds by *People v. Marshall* (1990) 50 Cal.3d 907, 933.) Indeed, a defendant may only challenge the admission of a third party witness's statement when such evidence would constitute a violation of the defendant's own right to due process of the law and a fair trial. (*People v. Jenkins* (2000) 22 Cal.4th 900, 966; *People v. Badgett* (1995) 10 Cal.4th 330, 347.) This is because "the primary purpose of excluding coerced testimony of third parties is to assure the reliability of the trial proceedings." (*Badgett*, *supra*, at p. 347.)

A statement is considered involuntary "if it is not the product of '"a rational intellect and free will."'" [Citation.] The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.'" (*People v. Maury* (2003) 30 Cal.4th 342, 404.) A statement may be coerced by either physical intimidation or psychological pressure. In cases of psychological coercion, the question is "'"whether the influences brought to bear upon the accused were 'such as to

overbear [the accused's] will to resist and bring about confessions not freely self-determined.' [Citation.]"'" (*Ibid*.) "'"The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable."'"' (*People v. Williams*, *supra*, 49 Cal.4th at p. 436; see also *People v. Ray* (1996) 13 Cal.4th 313, 340; *People v. Thompson* (1990) 50 Cal.3d 134, 166-167.)

"[M]ere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. [Citation.]" (*People v. Jimenez* (1978) 21 Cal.3d 595, 611, overruled on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 509-510, fn. 17.) The police "are not precluded from discussing any 'advantage' or other consequence that will 'naturally accrue' in the event the [witness] speaks truthfully about the crime." (*People v. Ray*, *supra*, 13 Cal.4th at p. 340.) However, the "line between a threat (or a promise) and a statement of fact or intention can be a fine one." (*People v. Thompson*, *supra*, 50 Cal.3d at p. 169.) When evaluating a claim of psychological coercion, "we must exercise great care not to become confused: intellectual persuasion is not the equivalent of coercion." (*People v. Ditson* (1962) 57 Cal.2d 415, 433.)

In reviewing the trial court's ruling regarding whether a statement was coerced, we examine the entire record, deferring to the trial court's credibility determinations and findings of fact where supported by substantial evidence. (*People v. Boyer* (2006) 38 Cal.4th 412, 444.) We may independently review the trial court's determination where, as here, the interview was recorded. (*People v. Vasila* (1995) 38 Cal.App.4th 865, 873.)

Defendant contends Uriostegui was subjected to coercion consisting of both threats of prosecution and offers of leniency causing him to provide an involuntary statement inculpating defendant. Specifically, he claims Uriostegui was confronted with the prospect of a prison term for facilitating defendant in the homicide and that this motivated him to provide the statement. He further contends the detectives implied that

16.

only a specific statement—that defendant confessed to the shooting—would in fact alleviate him of the prospect of being charged as an accessory. We disagree.

A thorough review of both the videotaped interview and its transcript reveals Uriostegui was simply confronted with the realities of his situation. The detectives informed Uriostegui of the items found in his home as well as the surrounding circumstances. They pointed out the circumstances that could be viewed as Uriostegui facilitating defendant. Specifically, Uriostegui admitted defendant had been at his home daily for the two days following the murder. Uriostegui saw defendant with the gun on the day of the police shooting and had seen him with a gun on prior occasions. Defendant brought Uriostegui some tools from a white maintenance truck on the day of the shooting, which Uriostegui purchased from him. The white truck defendant arrived in on Monday turned out to be the same truck the victim was killed over, and the tools Uriostegui bought were from that truck. Not only were each of these facts true, they certainly could be construed as facts supporting an accessory charge. (See *People v Daniels* (1991) 52 Cal.3d 815, 862-863 [informing witnesses who had helped defendant escape and hide from police that they could be prosecuted as accessories and asking that they cooperate with investigation held proper].)

As to the claim the officers threatened Uriostegui with prosecution, we find the tactics employed here were proper. Courts have repeatedly held "[t]here is nothing improper in confronting a suspect with the predicament he or she is in, or with an offer to refrain from prosecuting the suspect if the witness will cooperate with the police investigation." (*People v. Daniels*, *supra*, 52 Cal.3d at p. 863.)

In addition, we note the detectives did not use any deception in explaining the situation, a fact defendant seems to acknowledge. The mere fact of explaining the situation to Uriostegui cannot be deemed coercive. Uriostegui was never told he must make a specific statement to avoid liability for a possible accessory charge. Rather, the detectives repeatedly told Uriostegui to tell the truth. Indeed, throughout the interview,

17.

they explained they believed he was being truthful; however, they also told him they felt he was holding back information. The discussions regarding the possible consequences he would face as an accessory merely explained that the detectives needed all the information before deciding whether he was an accessory to the murder. Thus, informing Uriostegui he was either a witness or a suspect was not itself coercive. Taken in context, the detectives simply informed Uriostegui of the situation he was in and implored him to tell the whole truth. The detectives did not, as defendant claims, provide Uriostegui with the only statement that would be acceptable to them.

We have reviewed the tape recording of the interview, which is about an hour and a half in length. It reveals the detectives waited to get information from Uriostegui before confronting him with facts they knew. The officers never told Uriostegui what they wanted him to say or that he needed to inculpate defendant. Instead, they repeatedly told him (1) they did not need Uriostegui's statement for the prosecution of the case, (2) they just wanted the truth, (3) they felt he was holding something back due to how he was answering the questions and his body language, and (4) they did not want to put words in his mouth. Uriostegui described the truck and tools prior to the detectives bringing up the murder. Uriostegui also admitted he knew why the police were at his home and that he had heard of a shooting on Monday night prior to any discussions of the homicide. Further, Uriostegui admitted he had previously seen defendant with the same gun recovered from him during the police shooting. It was only after Uriostegui divulged this information that the detectives began talking about the homicide. The detectives never provided Uriostegui with any facts regarding the shooting itself. Rather, when Uriostegui mentioned defendant might have said something to him about the "situation," Detective Russell asked "what'd he say?" Uriostegui then explained defendant had told him about an "RTS" truck and that he did not actually believe what defendant had told him because he had come to the house in a white truck that did not appear to be an "RTS" truck. He noted defendant stated he was in a stolen car and that he had "bumped heads" with the

18.

victim who was trying to recover the truck. Again, Uriostegui claimed he did not believe the story and thought defendant was just bragging.

Uriostegui also stated defendant was with two of his friends, and the victim "tried to run up on his friend." He went on to say defendant "moved behind him" and Detective Fister asked Uriostegui to clarify—did he say he moved behind the victim or his friend? None of this information was provided to Uriostegui previously and the detectives asked several questions about what defendant said to clarify the statement. They asked whether defendant stated (1) if the victim was armed and (2) how defendant left the scene.

The circumstances in the present case are unlike the ones in *People v. Lee* (2002) 95 Cal.App.4th 772. There the court held a third party witness's statement was coerced because the police threatened to charge the witness with the crime at issue if he did not name the defendant as the shooter. (*Id.* at pp. 785-786.) The officer gave the witness a polygraph test and told him the computer was highly accurate. After asking the witness if he had shot the victim and if he knew who the shooter was, the officer confronted the witness, claiming the test showed a 97 percent probability that he had killed the victim. (*Id*. at p. 783.) He then went on to threaten to charge the witness with first degree murder unless he named the defendant as the killer. (*Ibid*.) It was the officer who told the witness the defendant was involved and it was the officer who provided the witness with the defendant's motive. (*Id*. at p. 785.)

As the court explained, the officer's statements "went beyond mere deceit as to the evidence pointing to [the witness] as the killer. He also went beyond merely exhorting [the witness] to tell the truth. He even went beyond threatening [the witness] with prosecution for first degree murder unless he named the real killer. [¶] [The officer] in essence told [the witness]: We will prosecute you for first degree murder unless you name [the defendant] as the killer." (*People v. Lee*, *supra*, 95 Cal.App.4th at p. 785.) The court noted the witness was never *Mirandized* after the officer claimed the polygraph test showed it was the witness who was the shooter, which indicated the defendant was

the real target of the interview. (*Lee*, at p. 786.) The court concluded the interrogation of the witness was "not designed to produce the truth as [the witness] knew it but to produce evidence to support a version of events the police had already decided upon." (*Ibid*.)

Unlike the situation in *Lee*, Uriostegui was never threatened with prosecution of the murder himself. In fact, the detectives specifically asked Uriostegui if he was present at the scene or had pulled the trigger, and when he said he had done neither, the detectives explained he had nothing to worry about in terms of a murder charge. While the detectives stated they already knew defendant had the gun that shot the victim, they never implied they had any scientific evidence to support their statements. Rather, they said the gun *would* come back as the murder weapon. Likewise, the detectives never filled in the gaps for Uriostegui; instead, they asked him at each step what the information was, noting they were not present when the defendant made his statements.

Additionally, the detectives never provided Uriostegui with a specific statement they wanted Uriostegui to make. While it was clear defendant was a suspect, the detectives never gave Uriostegui any facts of the crime itself. Rather, after Uriostegui acknowledged defendant may have said something to him about the crime, he went on to provide details the detectives had not provided to him. Specifically, he stated (1) defendant was in a stolen car, (2) the victim was arguing with defendant's "homeboy," (3) the victim tried to run up on defendant's friend, and (4) defendant and the other perpetrator left the scene in a car. Not only were these facts not provided to Uriostegui, they were facts only someone present at the scene would know. Indeed, these facts were corroborated by the witnesses to the murder. Considering how the interview progressed, the detectives' approach did not amount to a "psychological ploy[] which, under all the circumstances, [was] so coercive that [it] tend[ed] to produce a statement that is both involuntary and unreliable." (*People v. Ray*, *supra*, 13 Cal.4th at p. 340.)

To determine if a statement is voluntary we must look at the totality of the circumstances, including the details of the interrogation and the characteristics of the

20.

witness. (*People v. Hill* (1992) 3 Cal.4th 959, 981, overruled on other grounds by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) Here the totality of the circumstances supports a finding Uriostegui's statement was voluntary. First we note there was nothing heavy-handed about the interview. The detectives provided Uriostegui with his *Miranda* rights prior to the interview. They never raised their voices or put any undue pressure on Uriostegui. They did not use any deceptive practices.

Second, Uriostegui did not appear particularly fragile or unduly susceptible to coercion. Although Uriostegui had been detained for approximately nine hours, it does not appear he was particularly tired or uncomfortable in the tape recording. In fact, the detectives noted during the interview that they had provided him with a meal and water. Before beginning the interview, the detectives informed Uriostegui of defendant's condition. Further, they explained Uriostegui's family members had already been interviewed and released and had places to stay for the evening while the police were still processing the house.

Third, Uriostegui was no stranger to the criminal justice system, noting himself he had previously been "locked up" before. Further, he admitted he was an entrenched gang member. He did not appear to have a fragile mental state during the interview.

Finally, there was no evidence in this case Uriostegui felt coerced or that his statement was involuntary. Uriostegui never made any statements to the effect he felt pressured to make a statement, nor did he testify his statement was anything but voluntary. At trial he simply denied ever telling the detectives defendant admitted the shooting, and he claimed he did not recall what statements he made during the interview. He claimed defendant never confessed the shooting to him. Considering the totality of the circumstances, we do not find his statement was involuntary or coerced.

Defendant argues that in addition to threats, Uriostegui was also given promises of leniency in exchange for his statement. Initially, we note the detectives never promised charges would not be filed in the case if Uriostegui made a statement. With regard to the

21.

statements about the gun and narcotics found in Uriostegui's home, the detectives only stated that as "long as you're telling the truth, we're *probably* not gonna have any problems." (Italics added.) While the detective stated something could be "worked out," he did not suggest there would be no prosecution whatsoever. Indeed, he later stated he was "not saying … the files might not be charged … with the DA's office."

Defendant contends Uriostegui was given a specific promise of being released from custody that evening, and such a promise constituted an improper offer of leniency thereby requiring a finding his statement was coerced. Assuming Uriostegui was promised he would be released from custody, or was given any promise of leniency for that matter, we note there is a clear distinction between offers of leniency to a defendant as opposed to a witness. With regard to the confession of a defendant, the Supreme Court has stated, "'It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied.' [Citation.]" (*People v. Tully* (2012) 54 Cal.4th 952, 993.) However, "case law fails to support defendant's premise that a third party witness's statements are rendered inadmissible against a defendant if induced by improper offers of leniency. [Citations.]" (*People v. Ervin* (2000) 22 Cal.4th 48, 83.)

In *People v. Badgett*, *supra*, 10 Cal.4th 330, the defendants claimed a police officer had communicated to a potential witness that she would be released from custody if she cooperated. The defendants argued the witness's statements to police "were involuntary because they were the product of a promise of leniency." (*Id.* at p. 354.) The Supreme Court disagreed explaining: "All immunized witnesses are offered some quid pro quo, usually an offer of leniency. We have never held, nor has any authority been offered in support of the proposition, that an offer of leniency in return for cooperation with the police renders a third party statement involuntary or eventual trial testimony coerced. [T]estimony given under an immunity agreement does not violate the defendant's right to a fair trial, if the grant of immunity is made on condition the witness

22.

testifies fully and fairly." (*Id.* at pp. 354–355.) "If an offer of immunity is not considered coercive, then an offer of release from custody in return for cooperation likewise should not render a witness's statement coerced." (*Id.* at p. 355.)

In *People v. Badgett, supra*, 10 Cal.4th 330, the defendants were tried for murder. The primary prosecution witness was the 17-year-old girlfriend of one of the defendants, who testified he had admitted killing the victim to her. (*Id*. at pp. 339-340.) After the juvenile witness had been detained, her mother was advised by the authorities the witness would be released from custody if she cooperated with the police. (*Id*. at p. 354.) The mother conveyed this promise to her daughter, who then provided a statement to the police implicating the defendants. Subsequently, the witness was given formal immunity and testified pursuant to an immunity agreement. (*Id*. at p. 340.) The court addressed and rejected the defendants' argument that the witness's statement was involuntary because it was induced by a promise of leniency, specifically the promise she would be released from custody. (*Id*. at p. 355.)

Indeed the rules regarding how a statement from a third party witness can be used are often different from the rules regarding the use of a defendant's own statement. For example, while the fruit of a defendant's own coerced statement cannot be used against him, the same is not true of a third party witness's statement that is found to be coerced. (*People v. Williams, supra*, 49 Cal.4th at p. 455 ["the doctrines governing the exclusion of the 'fruit' or product of a *defendant*'s involuntary confession do not apply when the claim is that a *third-party* witness's statement was coerced"]; see *People v. Jenkins, supra*, 22 Cal.4th at p. 966.)

Likewise, the burden of proof regarding the voluntariness of a third party witness's statement is different from that of a defendant's statement. It is the defendant's burden to establish a statement of a third party witness is coerced if the defendant seeks to exclude the evidence from trial. (*People v. Douglas, supra*, 50 Cal.3d at p. 500.) However, when it is the defendant's own statement that is challenged as coerced, it is the

23.

People's burden to prove it was voluntary by a preponderance of the evidence. (*People v. Benson* (1990) 52 Cal.3d 754, 779) "[T]he heightened protections courts have traditionally afforded defendants in the self-incrimination context are designed to assure that an accused's coerced confessions will not be used against him, and to protect against evidence of guilt emanating from his own involuntary statements." (*People v. Douglas*, *supra*, 50 Cal.3d at p. 500.)

Furthermore,

> "defendants generally lack standing to complain that a police interrogation violated a third party witness's Fifth Amendment privilege against self-incrimination or Sixth Amendment right to counsel, nor may a defendant complain that law enforcement officers violated a third party witness's Fourth Amendment rights. (*People v. Badgett*[, *supra*,] 10 Cal.4th 330, 343.) A defendant may assert a violation of his or her own right to due process of the law and a fair trial based upon third party witness coercion, however, if the defendant can establish that *trial* evidence was coerced, or rendered unreliable by prior coercion, and that the admission of this evidence would deprive the defendant of a fair trial. (*People v. Jenkins*[, *supra*,] 22 Cal.4th 900, 966, 969; *People v. Badgett, supra*, 10 Cal.4th at pp. 347, 348.)" (*People v. Williams*, *supra*, 49 Cal.4th at pp. 452–453.)

Thus, we find any promise of leniency in this case was not improper. Further supporting our conclusion that the Uriostegui statement was not coerced is the recording itself. We have watched and listened to the recording and note the tone used could hardly be considered threatening, forceful or coercive. Consequently, under the totality of the circumstances, we are persuaded the statement was voluntarily given, and the use of the statement did not violate defendant's right to due process.

## II. Sentencing Claims

Defendant argues, and plaintiff concedes, (1) the trial court erred in doubling the terms for the enhancements pursuant to the three strikes law, (2) the sentence on count 6, active participant in a street gang, should have been stayed, and (3) defendant is entitled to additional custody credits. We agree and accept plaintiff's concession as to each of these claims. Defendant further contends the trial court erred by imposing a parole

24.

revocation fine (§ 1202.45), as he was sentenced to a term of life without the possibility of parole.  Plaintiff conceded this issue, however, we reject the concession.  We find the fine was properly imposed because defendant was also sentenced to a separate determinate term.

### A.  The Enhancements Were Improperly Doubled

In calculating defendant's sentence, the trial court imposed the term for each underlying count, added the enhancement, and then doubled the entire term pursuant to the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).  Specifically, the trial court chose count 5, the exhibiting a deadly weapon charge, as the principal term and imposed a three-year term with an additional three years for the gang enhancement (§ 186.22, subd. (b)).  The court then added the terms for the charge and enhancements together and doubled the entire term.  The court employed the same procedure for each of the remaining subordinate charges.[6]  This was error.

Pursuant to the three strikes law, when a defendant suffers a felony conviction and it has been proven the defendant has also suffered a prior strike conviction, the punishment for a determinate term is doubled.  (§§ 667, subd. (e)(1), 1170.12, subd. (c)(1).)  This provision applies only to the base term and not the enhancements.  (*People v. Sok* (2010) 181 Cal.App.4th 88, 93-94; *People v. Dominguez* (1995) 38 Cal.App.4th 410, 424.)  Thus, defendant's sentence on the determinate terms must be recalculated.

As we have explained, defendant was sentenced to the base term of three years on count 5 as the principal term.  That term should be doubled, and then the three-year

---

[6]The court sentenced defendant as follows:  On count 4, the court imposed an eight-month term for the offense as well as an additional one year for the enhancement, then doubled both terms, resulting in a term of three years four months, and stayed the term pursuant to section 654.  The court imposed identical terms on counts 2, 3, and 6, however each of those offenses was ordered to run consecutively.  Although the transcript of the sentencing proceeding reflects concurrent sentencing, that appears to be either a typographical error or a misstatement as both the abstract of judgment and the court's articulation of the sentence demonstrate the terms were to be consecutive.

enhancement should be added, resulting in a term of nine years. On count 4, the court imposed and stayed an eight-month term for the underlying charge of felon in possession of a firearm, and additionally imposed a one-year term for the enhancement. Using the above calculation, count 4 would result in a term of two years four months, which was stayed. On count 6, the active participant in a street gang charge, the court imposed a consecutive eight-month term, which was doubled pursuant to the three strike law. This was correct, however, as we explain later, this count must also be stayed. On counts 2 and 3, the court imposed identical terms: an eight-month term for the substantive charges as well as an additional one-year term for the enhancement. Using the correct calculation, this results in a two-year four-month sentence on each charge. Thus, the total determinate term in this case, taking into account the fact count 6 must be stayed, is 13 years 8 months. The trial court's sentence on the remaining counts from the additional violation of probation cases was properly imposed. Therefore, the total determinate term on all cases is 15 years 8 months.

**B.      The Sentence on Count 6 Must Be Stayed**

Defendant was convicted of murder, possession of a firearm by a felon, receiving stolen property, and brandishing a firearm to resist arrest. He was found to be an active participant in a street gang, and multiple enhancement allegations were found true. Defendant contends, properly, that his sentence for being an active participant in a street gang must be stayed as it is based upon the same act as the other offenses for which he was punished. Plaintiff concedes the issue and we accept the concession.

Section 654 provides in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) "The purpose of section 654 is to prevent multiple punishment for a single act or omission, even though that act or omission violates more than one statute and thus constitutes more than one

crime. Although the distinct crimes may be charged in separate counts and may result in multiple verdicts of guilt, the trial court may impose sentence for only one offense—the one carrying the highest punishment. [Citation.]" (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1135.)

Recently, in *People v. Mesa* (2012) 54 Cal.4th 191, 199, the California Supreme Court held that section 654 did not permit separate punishment for a section 186.22, subdivision (a) crime of active participation in a criminal street gang when the only evidence of such participation was the current charged offenses, even if there were multiple objectives. (*Mesa*, at pp. 199–200.) This is because the crime of being an active participant in a criminal street gang requires not only that the defendant be a member of the gang, but that he also promote, further, or assist in felonious conduct. (*Id*. at pp. 196-197.) Thus, where the underlying felony is also the act "'that transformed mere gang membership—which, by itself, is not a crime—into the crime of gang participation,'" section 654 bars multiple punishment for that single act. (*People v. Mesa*, *supra*, at pp. 197-198.)

In this case, defendant was charged in count 6 with violating section 186.22, subdivision (a). The only evidence of his active participation, however, was the evidence associated with the other charged offenses. Indeed, the jury was instructed that an element of that charge required a finding that defendant "assisted, furthered, or promoted felonious criminal conduct by members of the gang." The court further instructed the jury that felonious criminal conduct meant "committing or attempting to commit the following crime: murder, prohibited possession of a firearm, receiving stolen property, or brandishing a firearm to resist arrest." There was no other evidence admitted at trial demonstrating defendant promoted or assisted any other felonious criminal conduct other than the crimes for which he was convicted. Therefore, pursuant to *Mesa*, the court should have stayed the term it imposed on count 6. (*People v. Mesa*, *supra*, 54 Cal.4th at p. 199.)

27.

## C. Defendant's Credits Must Be Modified

At the sentencing hearing, the trial court, relying on the probation officer's report indicating defendant was arrested on December 8, 2008, awarded defendant 885 days of actual custody credit. However, as defendant contends and plaintiff concedes, defendant was actually arrested on November 26, 2008. Calculating from defendant's actual arrest date of November 26, 2008, to the sentencing date of May 10, 2011, it is apparent defendant is entitled to 896 days of credit. We will order the abstract of judgment amended accordingly.

## D. The Parole Revocation Fine Was Properly Imposed

Defendant's final contention is the trial court erred in imposing and suspending a parole revocation fine of $10,000 pursuant to former section 1202.45. Plaintiff has conceded the issue, however, this court rejects the concession in light of *People v. Brasure* (2008) 42 Cal.4th 1037.

The court imposed both a $10,000 restitution fine under former section 1202.4 and a $10,000 parole revocation fine under former section 1202.45, which the court stayed pending any violation of parole. Former section 1202.45 provided:

> "In every case where a person is convicted of a crime and whose sentence includes a period of parole, the court shall at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4. This additional parole revocation restitution fine shall … be suspended unless the person's parole is revoked."

In *People v. Brasure*, the California Supreme Court held that former section 1202.45 parole revocation fines should be included in a sentence whenever the sentence includes a determinate prison term, despite the simultaneous imposition of a life sentence without the possibility of parole. (*People v. Brasure*, *supra*, 42 Cal.4th at p. 1075.) This is because a determinate prison term under section 1170 includes a period of parole under section 3000. (*Brasure*, at p. 1075.) In *Brasure*, the defendant was sentenced to death

and an additional determinate term.  (*Id*. at p. 1049.)  The court held that although it was unlikely he would ever serve any part of the parole period on the sentence, nevertheless, the fine was mandated.

Likewise here, defendant was sentenced to life without the possibility of parole but, in addition, he was sentenced to a consecutive determinate term.  As the facts of this case are indistinguishable from *Brasure*, the parole revocation fine was required.  (*People v. Brasure*, *supra*, 42 Cal.4th at pp. 1049, 1075.)

## DISPOSITION

The judgment is modified to reflect a term of nine years on count 5 (three-year midterm, doubled pursuant to the three strikes law, plus three years for the enhancement), and a term of two years four months each on counts 2 and 3 (eight months, doubled pursuant to the three strikes law, plus one year for the enhancements).  The trial court is ordered to amend the abstract of judgment to reflect this modification—a section 654 stay on count 6—and to award defendant a total of 896 days of actual custody credits and forward a copy of the modified abstract of judgment to the Department of Corrections and Rehabilitation.  As modified the judgment is affirmed.

_____

PEÑA, J.

WE CONCUR:

_____

KANE, Acting P.J.

_____

FRANSON, J.