Filed 10/2/14  P. v. Betancourt CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065345 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN318833) |
| RICARDO BETANCOURT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed.

Mark D. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

A jury found defendant and appellant Ricardo Betancourt guilty of (1) the lesser-included offense of attempted voluntary manslaughter (Pen. Code,[1] §§ 192, subd. (a) &

---

[1]    Unless otherwise noted, all statutory references are to the Penal Code.

664; count 1), after finding him not guilty of attempted murder (§§ 187, subd. (a) & 664); and (2) assault with a deadly weapon (§ 245, subd. (a)(1); count 2). The jury found true the allegation that Betancourt personally used a deadly weapon (i.e., knife) (§ 12022, subd. (b)(1)) in connection with count 1, and inflicted great bodily injury (§ 12022.7, subd. (a)) on the victim, Rigoberto Vasquez, in connection with counts 1 and 2. The court sentenced Betancourt to prison for nine years six months.

Betancourt timely appealed from the judgment of conviction. Pursuant to *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*), appointed counsel filed a brief on behalf of Betancourt setting forth the facts of the case and requesting this court review the entire record.

In addition, pursuant to *Anders v. California* (1967) 386 U.S. 738, appointed counsel set forth the following possible, but not arguable, issues to assist us in conducting our *Wende* review: (1) whether the court correctly instructed the jury on the offense of attempted voluntary manslaughter; (2) whether the court erred in admitting under Evidence Code section 1235 Vasquez's statement to police, made two days after he was stabbed, identifying Betancourt as the responsible individual when Vasquez at trial subsequently testified he was not 100 percent certain who had stabbed him; (3) whether the court erred in refusing to allow the defense to impeach Vasquez with evidence he possessed several months after the stabbing a controlled substance when Vasquez initially was charged with possession for sale but later pleaded guilty to simple possession in violation of Health and Safety Code section 11377, subdivision (a); (4) whether the grant of immunity to Vasquez for being under the influence of a controlled substance on the night of the stabbing coerced his testimony; and (5) whether the trial

2

court erred in relying on Penal Code section 654, subdivision (a) when it stayed rather than struck Betancourt's sentence on the great bodily injury enhancement in count 2.

On our own motion, we gave Betancourt 30 days to file a brief on his behalf with this court. We also granted his request for a 30-day extension of time to file such a brief. He did not file any brief.

FACTUAL OVERVIEW

In early May 2013, Mayra Salazar testified she told Betancourt he needed to move out of her home after living together for about five months. Living with them at the time was their two-year-old son, Salazar's two other children and Salazar's cousin. Betancourt was angry Salazar asked him to move out.

A few days later, after Salazar finished working a late shift, she went home and was met by Vasquez and her cousin, who were friends. Salazar also considered Vasquez her friend, as she had known him for about 13 years. Salazar and Vasquez were not romantically involved. A little later that night, Salazar drove Vasquez to the store. When they returned a little after 2:00 a.m., Salazar saw Betancourt in front of her home "putting things in the car." Salazar was surprised to see Betancourt. Hoping to avoid a confrontation, Salazar parked in a visitor's space and waited for him to finish loading his car.

Salazar testified Vasquez exited the car and began walking toward her home. Before doing so, however, he told Salazar to move and park her car in front of her home. According to Salazar, she followed Vasquez in her car as he walked toward her home.

As Vasquez approached, Salazar saw Betancourt go inside and then come out a few minutes later. While Salazar was parking her car, she saw Betancourt and Vasquez

3

fighting. Salazar also saw "something" like a knife in Betancourt's right hand as they fought. During the fight, Vasquez fell to the ground. Betancourt nonetheless continued his attack. After the fight, Salazar drove Vasquez to the hospital. Vasquez was subsequently transported by ambulance to another hospital where he underwent emergency surgery.

A few days after the incident, Betancourt went to Salazar's work. Betancourt told Salazar, "It's not my fault. Why did he [i.e., Vasquez] have to get involved?" Salazar in response called the police. The police arrested Betancourt that night.

Vasquez testified on the night of the attack he and Salazar went to the store and, when they returned, they saw a car parked in front of Salazar's home. Waiting inside the car was one of Betancourt's friends. Vasquez, who was living in an RV near Salazar, walked toward Salazar's home because he had purchased some items for Salazar's cousin and because Vasquez was aware Betancourt had some "problem" with him but was not sure why.

Vasquez knocked on the front door of Salazar's home and then heard some yelling inside, presumably between Betancourt and Salazar's cousin. Betancourt responded to Vasquez, "You're the f-ing person I've been wanting to talk to." Recognizing that Betancourt was upset, Vasquez began to back away to allow Betancourt to "cool down." As he backed away, Vasquez saw Betancourt open the front door, come outside and approach him saying, "I'm going to get you." Vasquez remembered he "collapsed" and then "woke up." When he awakened, Vasquez testified he knew he had been stabbed because he pulled out a "piece" of a "kitchen" or "steak" knife that was lodged in his

4

upper diaphragm.  Vasquez testified he was not 100 percent sure Betancourt had been the one who stabbed him.

Vasquez received stab wounds to his upper arm and chest, and a slash to his forehead that was closed with five surgical staples.  Vasquez also suffered a collapsed lung and other internal injuries that led to the removal of his spleen.  Vasquez testified he was close to death.  While treating Vasquez, hospital personnel found a knife blade in Vasquez's pants.  The blade was turned over to the police.

A few days before the stabbing, Betancourt sent Vasquez text messages stating Vasquez was not to give Salazar any drugs.  Vasquez testified that although he smoked marijuana and methamphetamine, he neither gave nor sold Salazar any drugs.  Vasquez sent Betancourt a message back saying he had never given Salazar drugs.  According to Vasquez, Betancourt responded, "Okay, it's good."  Vasquez admitted he smoked marijuana on the day of, and smoked methamphetamine the day before, the stabbing.

Detective Paul Michalke testified he was assigned to investigate the stabbing of Vasquez.  Detective Michalke interviewed Vasquez in the hospital two days after Vasquez's surgery.  Detective Michalke found Vasquez was able to understand and respond to his questions, although Vasquez was obviously in pain.

Vasquez told Detective Michalke that in the early morning hours of May 6, 2013, Salazar had taken him to the store to purchase alcohol; that when they returned about 1:00 a.m., they saw Betancourt in front of Salazar's home; that Vasquez wanted to talk to Betancourt; that as Vasquez approached Salazar's home, Betancourt initially ran towards Vasquez, then turned around and ran inside the home; that when Betancourt came back

5

outside, he was holding a knife; that Betancourt ran towards Vasquez and said, "I'm going to kill you"; and that Betancourt stabbed him.

Detective Michalke also interviewed Salazar a few days after the stabbing incident. She told Detective Michalke that Betancourt did not have permission to go inside her home on the night Vasquez was stabbed; that when they returned from the store that night, they saw Betancourt outside her home putting some items into his car; that she parked in a visitor spot; that Vasquez told Salazar he was going to talk to Betancourt and started walking toward her home; and that, by the time she got out of her car, she saw Betancourt with a knife in his hand running toward Vasquez.[2]

After his arrest, Betancourt waived his *Miranda*[3] rights and agreed to talk to Detective Michalke at the police station. The interview was played for the jury.

In the interview, Betancourt initially blamed Vasquez for starting the fight that night. Betancourt believed that Vasquez and Salazar were having sex and that Vasquez was giving Salazar drugs. Betancourt became angry a few days before he moved out of Salazar's home because Salazar had ignored him on his birthday and instead had gone out with others, including Vasquez.

---

[2]    The record shows Salazar was also briefly interviewed by Deputy Sheriff Michael Guerrero, who testified he met Salazar at the hospital a few hours after the stabbing. Deputy Guerrero testified Salazar stated she saw Betancourt stab Vasquez an "unknown number of times" with a "chef's knife" while saying something to the effect of, "I [i.e., Betancourt] told you [i.e., Vasquez] I was going to do something to you."

[3]    *Miranda v. Arizona* (1966) 384 U.S. 436.

Betancourt initially denied having a knife.  However, Betancourt later admitted during the interview that after drinking about 12 beers, he grabbed a knife from a ledge inside Salazar's home and attacked Vasquez with it after Vasquez came to the front door.

DISCUSSION

Based on our independent review of the entire record, we conclude the trial court's jury instruction regarding the crime of attempted voluntary manslaughter was a proper statement of the law, as was also noted by the defense when the jury was being instructed.  (See CALCRIM No. 603.)

We also conclude the court properly exercised its discretion in admitting under Evidence Code section 1235 Detective Michalke's testimony that, when he briefly interviewed Vasquez in the hospital two days after the incident, Vasquez stated it was Betancourt who had stabbed him in front of Salazar's home, while yelling at Vasquez, "I'm going to kill you."  (See Evid. Code, § 1235 [providing "[e]vidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing"].)

Here, the record shows Vasquez testified he could not be 100 percent certain who stabbed him, which testimony was clearly inconsistent with the previous statements he made to Detective Michalke shortly after the incident.  Moreover, to the extent Vasquez was retreating from his previous identification of Betancourt as his attacker, the prosecutor was entitled to challenge Vasquez's claimed failure of memory.  (See *People v. Cowan* (2010) 50 Cal.4th 401, 462; *People v. Avila* (2006) 38 Cal.4th 491, 579-580.)

We also conclude the court properly exercised its discretion in refusing to allow the defense to impeach Vasquez with evidence he was charged several months after the

7

stabbing with possession of a controlled substance (i.e., methamphetamine) for sale, but later pleaded guilty to simple possession. "The admission of past misconduct involving moral turpitude to impeach a witness in a criminal trial is subject to the trial court's discretion under Evidence Code section 352. [Citation.] On appeal, the trial court's decision is reviewed for abuse of discretion. [Citations.] To constitute an abuse of discretion, 'the resulting injury [must be] sufficiently grave to manifest a miscarriage of justice. [Citation.] In other words, . . . the court [must] exceed[ ] the bounds of reason, all of the circumstances being considered.' [Citation.] In most instances the appellate courts will uphold the exercise of discretion even if another court might have ruled otherwise. [Citation.]" (*People v. Feaster* (2002) 102 Cal.App.4th 1084, 1091-1092.)

Here, the record shows when the deputies arrested Vasquez with respect to this charge they searched his cell phone and found what appeared to be text messages that *they* interpreted as suggestive of sales. The United States Supreme Court recently held in *Riley v. California* (2014) ___ U.S. ___ [134 S.Ct. 2473] that the interests in both protecting a police officer's safety and preventing the destruction of evidence do *not* justify dispensing with the warrant requirement for searches of digital information on a cell phone.

Moreover, whether in fact Vasquez was selling a controlled substance would have invited a "trial within a trial," an event that would have resulted in an undue consumption of time with minimal probative value, given Vasquez freely admitted during testimony that he used methamphetamine on and off for about eight years and had actually used this drug the day before the attack. Thus, refusing to allow the defense to go "behind" his

8

conviction for simple possession was a proper exercise of the court's broad discretion. (See *People v. Feaster*, *supra*, 102 Cal.App.4th at pp. 1091-1092.)

Finally, the trial court correctly noted Vasquez's conviction for simple possession of a controlled substance was *not* a crime involving moral turpitude that may be used to impeach a witness. (See *People v. Castro* (1985) 38 Cal.3d 301, 315-317.)

After independently reviewing the record, we find no support Vasquez's testimony was coerced as a result of the grant of immunity for the misdemeanor charge of being under the influence of methamphetamine on the night of the stabbing. (See *People v. Boyer* (2006) 38 Cal.4th 412, 445 [noting that "[t]here is nothing improperly coercive about confronting a lesser participant in a crime with his or her predicament, and offering immunity from prosecution for the witness's criminal role in return for the witness's promise to testify fully and fairly"].)

Indeed, the record supports a contrary finding, inasmuch as Vasquez testified (*after* the grant of immunity) that he could not be 100 percent certain who stabbed him, even though he previously told the police (*before* the grant) that Betancourt was his attacker. (See *People v. Badgett* (1995) 10 Cal.4th 330, 354 [noting that because a witness did not testify in conformity with earlier statements made by the witness, the "defendants fail in the essential task of connecting the pressures brought to bear on the witness before trial with [his] ultimate trial testimony" and, as such, rejecting claim witness's testimony was coercive as a result of offer of leniency].)

In addition, the record shows the grant of immunity did not require Vasquez to testify in a particular manner or to a particular version of events (i.e., in conformity with any prior statements, as noted), but rather was conditioned entirely on him telling the

9

truth. (See *People v. Boyer*, *supra*, 38 Cal.4th at p. 445.) The record also shows the defense subjected Vasquez to vigorous cross-examination and thus availed itself of "the most powerful means in its arsenal for challenging the reliability of [a] witness's statements." (See *People v. Williams* (2010) 49 Cal.4th 405, 455.)

We also conclude the trial court properly stayed under section 654, subdivision (a) the section 12022.7, subdivision (a) great bodily injury enhancement in count 2. Finally, a review of the entire record pursuant to *Wende*, *supra*, 25 Cal.3d 436 has disclosed no other reasonably arguable appellate issue.

DISPOSITION

Betancourt's judgment of conviction is affirmed.

BENKE, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.